# STATE OF CONNECTICUT *v.* LAZALE ASHBY
## (SC 18190)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

Convicted of the crimes of capital felony, murder, felony murder, sexual assault in the first degree, kidnapping in the first degree, and burglary in the first degree in connection with the stabbing and strangulation of the victim in her apartment, the defendant appealed to this court. The police arrested the defendant when his DNA profile was matched to DNA taken from the victim's vaginal swab, and, after the defendant was confronted with that evidence, he gave the police a written confession. Evidence presented at trial established that a second, unidentified male also contributed to the DNA on the victim's vaginal swab, and unidentified male DNA also was discovered on the doorframe of the victim's bedroom and in saliva found on the victim's shoulder. Prior to the defendant's trial, P, a jailhouse informant who was incarcerated with the defendant, wrote a letter to W, a detective with the Hartford Police Department, indicating that he had information about the defendant that would be useful to W and referencing an unrelated criminal case pending against the defendant. W subsequently met with P at the prison, where they discussed the defendant's involvement in the victim's death, whether P might receive a benefit for providing additional information,

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker. Although Justice Palmer was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

336 Conn. 452          APRIL, 2021          453

State *v.* Ashby

and whether P would be willing to wear a wire. When W did not contact
P again after the meeting, P informed the defendant of the meeting, and
the defendant devised a ruse intended to undermine W's credibility in
anticipation of W's testimony at trial. A few days before the state was
to rest its case, P contacted W and informed W of the defendant's ruse,
and the state notified the defense that it intended to call P as a witness.
The defendant filed a motion to suppress P's testimony, which the trial
court denied, concluding that P had not been acting as an agent of the
state when he elicited information from the defendant. Thereafter, the
defendant requested an instruction on third-party culpability in connec-
tion with the presence of the unidentified male DNA found in and on
the victim's body and at the crime scene, but the trial court declined
to give that instruction. On appeal from the judgment of conviction, the
defendant claimed that the state violated his sixth amendment right
to counsel by using P as an agent to deliberately elicit incriminating
statements from the defendant, there was insufficient evidence to sup-
port his conviction of burglary in the first degree, and the trial court
improperly declined to provide a third-party culpability instruction to
the jury in light of the unidentified male DNA discovered in and on the
victim's body and at the crime scene. *Held*:

1. The trial court improperly denied the defendant's motion to suppress
   P's testimony in violation of the defendant's sixth amendment right to
   counsel because P was acting as an agent of the state when he deliber-
   ately elicited incriminating statements from the defendant, and, accord-
   ingly, the judgment of conviction was reversed and the case was
   remanded for a new trial: although there was no express or formal
   agreement between P and W, in light of the totality of the circumstances,
   P's efforts to elicit incriminating statements from the defendant were
   fairly attributable to the state, as the meeting between P and W empha-
   sized what useful, incriminating information P might obtain as a result
   of his future assistance and specifically focused on P's efforts to obtain
   information from the defendant, possibly through wearing a wire or by
   other means, about his specific involvement in the victim's death rather
   than his involvement in unrelated criminal cases; moreover, P and W
   discussed P's interest in receiving a benefit in exchange for his coopera-
   tion, W indicated that the state's attorney would have to approve any
   such deal, and, after P testified at the defendant's trial, the state in fact
   provided P with his desired benefit by agreeing not to object to P's
   attempt to secure a sentence modification, which P and W had discussed
   during their meeting; furthermore, the psychological pressures inherent
   in confinement, along with P's lengthy consecutive sentences, provided
   P with a strong incentive to cooperate with the state, W never directed
   P to cease eliciting information from the defendant or to avoid conversa-
   tions with the defendant until the state's attorney had approved of P's
   cooperation with W, and the state either knew or should have known

State *v.* Ashby

that W's meeting with P was likely to result in further elicitation of information from the defendant.

(*One justice concurring in part and dissenting in part*)

2. This court declined the defendant's invitation to overrule its holding in *State* v. *Allen* (216 Conn. 367), and, accordingly, the defendant could not prevail on his claim that the evidence was insufficient to establish that he remained unlawfully in the victim's apartment for purposes of his conviction of burglary in the first degree; contrary to the defendant's assertion that *Allen* improperly conflates the burglary elements of intent and unlawful remaining, that case stands for the narrow proposition that the state may prove an unlawful remaining on the premises, for purposes of first degree burglary, by proffering evidence that a defendant has engaged in conduct on the premises that was likely to terrorize the occupants, and the defendant advanced no argument that his conduct in the victim's apartment was unlikely to terrorize the victim; moreover, this court's narrow reading of *Allen* was bolstered insofar as the Appellate Court has consistently restricted its application of *Allen* to cases in which the state has presented evidence that the defendant engaged in conduct likely to terrorize occupants, and the fact that the legislative history of recent amendments to the burglary statutes strongly indicated that the legislature has acquiesced in this court's decision in *Allen* counseled strongly against overruling *Allen* in favor of a more restrictive statutory interpretation of the relevant statutory ((Rev. to 2001) §§ 53a-100 (b) and 53a-101 (a) (2)) language; furthermore, variations among jurisdictions with respect to the law of burglary and license to remain did not justify departing from the weighty considerations attendant to stare decisis.

3. The trial court abused its discretion by declining to provide a third-party culpability instruction to the jury, as the defendant established a direct connection between a third person and the charged offenses; the evidence reasonably supported an instruction on third-party culpability, as unidentified male DNA was recovered directly from the victim's body and from the blood covered doorframe of her bedroom, rather than from the periphery of the crime scene, and the DNA on the victim's shoulder would have existed only for a limited duration and was not otherwise explained by the record.

Argued April 29, 2019—officially released August 6, 2020**

*Procedural History*

Substitute information charging the defendant with three counts of the crime of kidnapping in the first degree, two counts of the crime of capital felony, and one

** August 6, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Ashby

count each of the crimes of murder, felony murder, sexual assault in the first degree, and burglary in the first degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Espinosa, J.*; verdict of guilty; thereafter, during the penalty phase of the proceedings, the jury found that the existence of aggravating factors outweighed the mitigating factors, and the court rendered judgment of guilty in accordance with the verdict and imposed the death penalty on each count of capital felony and terms of imprisonment on the remaining counts, from which the defendant appealed to this court; subsequently, the trial court, *Dewey, J.*, granted in part the defendant's postjudgment motion for an evidentiary hearing but denied the relief requested; thereafter, the trial court, *Baldini, J.*, resentenced the defendant on each count of felony murder to a term of life imprisonment without the possibility of release. *Reversed*; *new trial*.

*Adele V. Patterson*, senior assistant public defender, *Jennifer L. Bourn*, supervisory assistant public defender, and *Judith L. Borman*, former senior assistant public defender, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *John Fahey*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, C. J. The principal issue in this appeal is whether the state violated its affirmative obligation under *Massiah* v. *United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), and its progeny to respect and preserve an invocation of the right to counsel under the sixth amendment to the United States constitution by using a jailhouse informant, Kenneth Pladsen, Jr., to deliberately elicit certain incriminating statements from the defendant, Lazale Ashby. The

State *v.* Ashby

defendant, who was convicted of several crimes in con-
nection with a murder in the city of Hartford on the
night of December 1, 2002, appeals[1] from the underlying
judgment, raising numerous claims of error. For the rea-
sons that follow, we conclude that the defendant's con-
stitutional right to counsel was violated and, accord-
ingly, that he is entitled to a new trial on all counts.
With respect to the defendant's other claims, we con-
clude that (1) he is not entitled to a judgment of acquittal
on the charge of burglary in the first degree in violation
of General Statutes (Rev. to 2001) § 53a-101 (a) (2) on
the ground of insufficient evidence, and (2) the trial
court improperly declined to provide a third-party cul-
pability instruction to the jury in light of certain uniden-
tified male DNA discovered at the crime scene.[2]

The record reveals the following relevant facts and
procedural history. On December 1, 2002, the victim[3]
was living with her two year old daughter on the second
floor of a three story apartment building located on
Zion Street in Hartford. At approximately 7 p.m. that
evening, Yvette Davila, who lived in an apartment on
the third floor, invited the victim's daughter upstairs to
watch Rudolph the Red-Nosed Reindeer on television.
The victim went upstairs about one-half hour later, left

---

[1] The defendant appealed directly to this court pursuant to General Stat-
utes § 51-199 (b) (4).

[2] The defendant has raised more than two dozen additional claims on
appeal. These claims relate to, inter alia, isolated evidentiary rulings, the
posttrial discovery of evidence, and certain inadvertent mistakes or omis-
sions. Still other claims arise from various tactical decisions. In light of the
information contained in the record and the positions adopted by the parties
in their briefs, we are unable to conclude that such claims are likely to
arise on remand. Accordingly, we decline to review those claims in the
present appeal.

[3] In accordance with our policy of protecting the privacy interests of the
victims of sexual assault, we decline to identify the victim or others through
whom the victim's identity may be ascertained. See General Statutes § 54-
86e; see also, e.g., *State* v. *Weatherspoon*, 332 Conn. 531, 536 n.3, 212 A.3d
208 (2019).

State *v.* Ashby

her daughter with Davila, and never returned. Although Davila made several attempts to contact the victim over the hours that followed, those efforts proved unsuccessful. Davila's husband, Daniel Roman, went downstairs the following morning, noticed that a door to the victim's apartment was ajar, and stepped into the victim's kitchen. Once inside, Roman saw the victim's naked body lying on the floor of an adjacent bedroom. Roman then went back upstairs to his apartment, where he and Davila called the police at 7:17 a.m.

The evidence offered at trial indicates that the victim died as the result of strangulation. Specifically, an examination of the body revealed petechial hemorrhages and neck abrasions consistent with the use of an irregular ligature. The victim had also sustained several nonfatal injuries, including numerous stab wounds to her back. Forensic evidence did not establish an exact time of death, but the presence of rigor mortis indicated that the victim had been dead for hours by the time the paramedics arrived that morning. A significant amount of blood was found in both the kitchen and the bedroom.

The police subsequently developed an unspecified lead and, as a result of that information, were able to obtain a warrant for a sample of the defendant's DNA to test against several samples collected from the crime scene. Those tests revealed that the defendant and an unidentified male were contributors to certain DNA profiles developed from the victim's vaginal swab. On September 3, 2003, the defendant, who was eighteen years old at the time, was arrested by the police. He waived his *Miranda*[4] rights and then was questioned at length. Although the defendant initially denied knowing or having sex with the victim, he ultimately gave a written confession after being confronted with the results of the

---

[4] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

State *v.* Ashby

testing that had been performed on the victim's vaginal swab.[5]

The operative information in the present case contained nine counts, including two counts of capital felony; General Statutes (Rev. to 2001) § 53a-54b (5) and (6); one count of murder; General Statutes § 53a-54a (a); one count of felony murder; General Statutes (Rev. to 2001) § 53a-54c; one count of sexual assault in the first degree; General Statutes § 53a-70 (a) (1); three counts of kidnapping in the first degree; General Statutes § 53a-92 (a) (2) (A), (B) and (C); and one count of burglary in the first degree. General Statutes (Rev. to 2001) § 53a-101 (a) (2). The defendant pleaded not guilty, and a trial commenced on May 8, 2007.[6] On June 27, 2007, a jury returned a verdict finding the defendant guilty on all counts. The trial court subsequently rendered a judgment of conviction in accordance with the jury's verdict.[7] This appeal followed. See footnote 1 of this opinion.

---

[5] The defendant's statement indicated that the victim had attacked him in the kitchen with a knife. The defendant stated that the resulting struggle moved to the bedroom and that the victim had eventually asked, "[w]hat do you want sex?" The defendant allegedly said yes and then had unprotected sex with the victim. The defendant stated that, after they were done, the victim attacked him again with the knife. The defendant stated that he then stabbed the victim, that she stopped moving, and that he left her face down on the bed. After a police officer noted that there was no mention of strangulation, the defendant amended his statement to include the fact that he had used his hands to get the victim to stop making noise.

Several factual discrepancies between this account and the physical evidence discovered at the crime scene were noted at trial and, indeed, remain contested in the present appeal. The extent to which the defendant's memory may have been impaired by drug use, both on the night of the victim's death and during his interrogation, also remains disputed.

[6] General Statutes (Rev. to 2001) § 53a-54b (5) and (6) proscribe, respectively, murder during the course of a kidnapping and murder during the course of sexual assault in the first degree. Because the defendant was charged with these capital offenses, the guilt and penalty phases of the trial were bifurcated pursuant to General Statutes (Rev. to 2001) § 53a-46a, as amended by Public Acts 2001, No. 01-151, §§ 1 and 2.

[7] Although the defendant was originally sentenced to death on the capital felony counts, he was subsequently resentenced to a term of life imprison-

State *v.* Ashby

I

We begin with the defendant's claim that the state violated his right to counsel under the sixth amendment.[8] Pladsen, a jailhouse informant who was incarcerated with the defendant prior to and during the defendant's trial, testified that the defendant had asked him to participate in a ruse intended to undermine the credibility of Andrew Weaver, a detective with the Hartford Police Department. The defendant sought to suppress that testimony pursuant to *Massiah* v. *United States*, supra, 377 U.S. 201, and its progeny, arguing that Pladsen had deliberately elicited incriminating statements while acting as an agent of the police. On appeal, the defendant claims that the trial court incorrectly concluded that no agency relationship existed and, as a result, improperly denied his motion to suppress Pladsen's testimony pursuant to *Massiah*. In response, the state contends that the trial court's conclusion was correct, and, therefore, the defendant's motion to suppress was properly denied. We agree with the defendant.

The record reveals the following additional undisputed facts relating to Pladsen's involvement in the present case. On December 27, 2006, Pladsen wrote a letter to Weaver. At that time, Pladsen was an inmate at Northern Correctional Institution (Northern) in Somers and interacted with the defendant on a regular basis.[9] That letter stated, among other things, that Pladsen had information about the defendant that could prove "very

---

ment without the possibility of release on those charges. See, e.g., *State* v. *Peeler*, 321 Conn. 375, 377, 140 A.3d 811 (2016); *State* v. *Santiago*, 318 Conn. 1, 85–86, 122 A.3d 1 (2015).

[8] A defendant's right to counsel under the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *State* v. *Leconte*, 320 Conn. 500, 505 n.2, 131 A.3d 1132 (2016).

[9] The record indicates that Pladsen and the defendant occupied cells close to one another and typically participated in recreation outside of the presence of other inmates.

State *v.* Ashby

useful'' to Weaver, that Pladsen was scheduled to be paroled to serve a separate fifty-five year sentence in Iowa, and that Pladsen would be extradited back to Connecticut after serving that sentence. The letter referenced certain individuals involved in another criminal case that was pending against the defendant and included the following invitation: "You want my help, come [and] see me [and] we'll talk." The letter stated that Pladsen was not seeking a transfer to another correctional institution, a sentence reduction, or "anything like that."

In response to Pladsen's letter, Weaver scheduled a meeting that was held in a private office at Northern on January 5, 2007. During that meeting, Weaver and Pladsen spoke specifically about the defendant's involvement in the victim's death. Pladsen did not convey any detailed information but, instead, provided only general facts to show that "he might know something." At some point during that conversation, Weaver inquired whether Pladsen would be willing to wear a wire.[10] Pladsen initially expressed some concern but ultimately agreed. Pladsen also asked whether he would benefit in some way from providing information about the defendant.[11] Weaver said that any "deals" or plans to use a wire would have to be approved by the Office of the State's Attorney and that he would get back to Pladsen.[12] Pladsen said

---

[10] Although the state's brief appears to contest whether Weaver made an affirmative request, the trial court's factual findings, Pladsen's testimony, and the state's own arguments at trial indicate, at the very least, that the topic of using a wire was broached by Weaver.

[11] Pladsen testified that he had specifically asked Weaver about the possibility of receiving a sentence modification. Weaver testified that Pladsen did not expressly mention what kind of benefit he was seeking.

[12] The record contains conflicting indications regarding the impact of Weaver's statement. For example, Pladsen testified that, during this meeting, he had told Weaver that he "would try" to get more information from the defendant and that Weaver had not dissuaded him from doing so. Pladsen also testified that he continued his general "effort to obtain information from [the defendant]" after the meeting with Weaver. On another occasion, Pladsen testified: "I remember telling [Weaver that] I don't mind going back

State *v.* Ashby

that he understood. Weaver then added that the police are "always interested" in gathering information about criminal matters from reliable sources and that he would be willing to listen to, and subsequently verify, anything Pladsen had to say. Weaver also made Pladsen generally aware that the defendant's trial was imminent and that the Office of the State's Attorney would be told any relevant information. Weaver then told Pladsen that, because of his criminal record and history, his word "[w]asn't going to be good enough . . . ."

The Office of the State's Attorney subsequently advised Weaver to take no further action with respect to Pladsen. As a result, Weaver did not follow up with Pladsen as Weaver had promised. Over the months that followed, a corrections officer contacted Weaver on a few occasions to let him know that Pladsen wanted to speak again. On May 17, 2007, Weaver asked a corrections officer to inform Pladsen that "nothing . . . had changed" and that Weaver would try to be in touch again soon.[13]

Pladsen testified that he eventually told the defendant about the meeting with Weaver. Pladsen stated that the defendant had then made a plan for Pladsen to feed Weaver information about the case so that the state would call Pladsen as a witness. According to Pladsen,

---

trying to get some more information in the meantime, and I remember him saying, well just let me run it by the . . . state's attorney first and let's see [how] this wire pans out, and he never got back to me." Finally, Pladsen testified that his decision to ask the defendant to write a note was a "spur of the moment type of thing . . . ." In light of these discrepancies, we are unable to agree with the assertion of the concurring and dissenting justice that the record contains "[no] evidence that Pladsen ever informed Weaver that he intended to obtain information from the defendant." Pladsen's testimony on this point was simply inconsistent.

[13] In light of the messages both into and out of Northern, we respectfully disagree with the contention of the concurring and dissenting justice that "Weaver never communicated directly with Pladsen" in the months following their meeting at Northern.

State *v.* Ashby

he was then supposed to lie on the stand and say that he had received that information from Weaver. Pladsen testified that he asked the defendant to write the information down and that the defendant had created a one page note as a result. On May 28, 2007, a few days before the state was scheduled to rest its case, Weaver received multiple telephone calls indicating that Pladsen wanted to get in touch again. Pladsen testified that Weaver called him the following day to ask what information Pladsen had. Pladsen then read Weaver the note over the telephone.[14]

The state immediately notified the defense of its intention to call Pladsen as a witness and disclosed a copy of a five page report by Weaver detailing the preceding events. On May 30, 2007, the defendant filed a motion seeking to suppress Pladsen's testimony pursuant to, inter alia, the sixth amendment. The following day, the trial court commenced an evidentiary hearing outside of the presence of the jury. During that hearing, Weaver and Pladsen testified about the nature of their conversations and the various events leading up to the creation of the note. In particular, Pladsen testified that he had acted on his own accord and that Weaver had not promised him anything.

At the close of the evidentiary hearing, the trial court orally denied the defendant's motion to suppress Pladsen's testimony.[15] In a subsequent, written memorandum of decision, the trial court concluded that Pladsen was not acting as an agent of the state. In reaching that conclusion, the trial court expressly found Pladsen's

---

[14] Pladsen also testified that the defendant became angry later that day about the fact that the note had been given to the prosecution. Pladsen testified that he had told the defendant that the note must have been discovered in the trash and that the defendant had then asked him to claim authorship.

[15] The trial court file contains an incorrect notation by the clerk indicating that the defendant's motion to suppress Pladsen's testimony was granted.

State *v.* Ashby

testimony to be credible. The trial court reasoned: "Testimony demonstrated that Pladsen and Weaver had no contact prior to January, 2007, and that Pladsen initiated the first contact. There is no evidence to suggest that the state, at any point, had a plan to enlist Pladsen's help in obtaining incriminating evidence from the defendant or had made an agreement with Pladsen to obtain such evidence. In fact, all [the] evidence indicates that there was no plan or agreement. Likewise, there is no evidence to suggest that . . . any . . . law enforcement agency was involved in the decision to house Pladsen near the defendant. Weaver never instructed Pladsen to obtain incriminating evidence about the defendant but, in fact, told him that any action would require prior approval by the [Office of the State's Attorney]. Weaver was advised not to pursue the matter and never initiated further contact with Pladsen. When Weaver later contacted Pladsen, it was only in response to multiple messages requesting a return call. In addition, Weaver made no promises or offers to Pladsen and told him that he had no authority to do so. Finally, the defendant continued to discuss the details of his case with Pladsen, even after he knew that Pladsen had met with Weaver."

After the trial court denied the defendant's motion to suppress, the following evidence was presented to the jury. Pladsen testified that he was an inmate at Northern, again recounted the defendant's ruse to discredit Weaver, and identified a particular exhibit submitted by the state as the note that the defendant had written.[16] Although Pladsen was subjected to extensive cross-examination regarding his criminal history, mental health, and possible motives, he testified that he was receiving absolutely no benefit in exchange for his testi-

[16] Pladsen also recounted the defendant's reaction to the state's discovery of the note and the conversation that followed. See footnote 14 of this opinion.

State *v.* Ashby

mony. The state then presented testimony from a hand-writing expert, Greg Kettering, who concluded that there was "no doubt" that the note shared a common authorship with known samples of the defendant's writing. The note was then admitted into evidence as a full exhibit over the defendant's objection. The contents of that note stated, among other things, that the author had "used the bloody tank top on the floor to strangle [the victim], and that's the murder weapon."[17]

Pladsen subsequently filed a motion in the Superior Court seeking modification of a twenty-five year sentence he had received for an assault on a corrections officer.[18] The state consented to a hearing on that motion, which was held on December 23, 2016, pursuant

---

[17] Following the defendant's conviction, the trial court held an evidentiary hearing pursuant to *State* v. *Floyd*, 253 Conn. 700, 732, 756 A.2d 799 (2000), in order to explore whether the state had, yet failed to disclose, an agreement with Pladsen at the time of trial, in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). During that hearing, the lead prosecutor at the defendant's trial, Senior Assistant State's Attorney John Fahey, testified that he had made no deals with Pladsen at the time of trial and that they had not discussed the possibility of a sentence modification. Fahey testified that he had promised Pladsen only that he would, "if ever requested, as a commissioner of the Superior Court, make known to a judge [the] good, bad and indifferent . . . ."

Two other witnesses testified at that hearing about the interactions between Fahey and Pladsen. The first of those witnesses, a corrections officer who had been assaulted by Pladsen, Karen Stratton White, testified that Fahey had visited her in 2015 to discuss modification of the twenty-five year sentence that had resulted from that assault. White testified that, during that discussion, she received the impression that Fahey wanted her "to go along with Pladsen having [a sentence modification] hearing" and that Fahey had "given his word" because Pladsen "had helped him with that other case." The second witness, Pladsen's mother, Judy Yvonne Pladsen, testified that she had spoken with Fahey at the time of the defendant's trial and that he had "guaranteed" her that the court would modify her son's sentence in exchange for providing testimony against the defendant. In rejecting the defendant's *Brady* claim, however, the trial court expressly declined to credit the testimony of these two witnesses, stating that "[n]either was in a position to either confirm or deny the existence of any agreement."

[18] Records of that proceeding are the proper subject of judicial notice. See, e.g., *Shirley P.* v. *Norman P.*, 329 Conn. 648, 660, 189 A.3d 89 (2018).

State *v.* Ashby

to General Statutes § 53a-39 (b). At that hearing, the state represented that Pladsen's motion for a sentence modification "was made . . . in the spirit of what [Senior Assistant State's Attorney John] Fahey had indicated to . . . Pladsen, that [the state] would make the court aware of what [Pladsen] had done . . . ." See footnote 17 of this opinion. Although the state consented to the hearing, it took no position on whether Pladsen's motion should be granted. After listening to testimony from the corrections officer who Pladsen had assaulted, the trial court in that case denied Pladsen's motion.

On appeal, the defendant claims that the trial court improperly denied his motion to suppress Pladsen's testimony. Specifically, the defendant claims that his sixth amendment right to counsel was violated when the state used Pladsen as an agent to deliberately elicit incriminating statements. In order to obtain relief on such a claim, a defendant must prove the following: "(1) the [s]ixth [a]mendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's [counsel] being present; and (3) that agent deliberately elicit[s] incriminating statements from the defendant." (Internal quotation marks omitted.) *Henderson* v. *Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006), cert. denied, 549 U.S. 1252, 127 S. Ct. 1383, 167 L. Ed. 2d 160 (2007); see also *Massiah* v. *United States*, supra, 377 U.S. 206; *Stewart* v. *Wagner*, 836 F.3d 978, 985 (8th Cir. 2016); *State* v. *Swinton*, 268 Conn. 781, 854, 847 A.2d 921 (2004).

The defendant's presentation of this claim, which focuses on the question of agency, turns on the following general themes: "(1) Weaver's encouragement . . . of Pladsen, (2) Pladsen's agreement to provide evidence and wear a wire, and (3) the state's failure to take any action to call off Pladsen . . . ." The defendant asserts that "[t]he trial court's and [the] state's constrained

State *v.* Ashby

view of agency as requiring explicit instruction, or as requiring that the informant adhere to a preexisting plan . . . is unsupported . . . [by] the case law'' and that the state ''knew or should have known that Weaver's interaction with Pladsen created a situation likely to induce [the defendant] into unknowingly giving uncounseled, incriminating statements to a person who had agreed to help the state obtain evidence . . . .''

In response, the state argues that the trial court correctly concluded that Pladsen was not acting as an agent of the government. The state supports this argument by pointing to several of the same facts relied on by the trial court. Specifically, the state highlights (1) the absence of specific plans or instructions, (2) the fact that Pladsen appeared to be self-motivated, (3) Weaver's statement that he could not personally approve any plans or deals, and (4) the fact that Weaver never followed up with Pladsen after their initial meeting.

The state concedes, as it must, that the defendant's sixth amendment right to counsel attached well before Pladsen's involvement. See, e.g., *Kirby* v. *Illinois*, 406 U.S. 682, 689–90, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972). Likewise, the state advances no argument that Pladsen's actions fell short of deliberate elicitation. See, e.g., *Kuhlmann* v. *Wilson*, 477 U.S. 436, 459, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986). Finally, the state does not claim the absence of prejudice or otherwise invoke the harmless error doctrine. See, e.g., *United States* v. *Miller*, 116 F.3d 641, 667–69 (2d Cir. 1997), cert. denied, 524 U.S. 905, 118 S. Ct. 2063, 141 L. Ed. 2d 140 (1998), and cert. denied sub nom. *Arroyo* v. *United States*, 524 U.S. 905, 118 S. Ct. 2063, 141 L. Ed. 2d 140 (1998). Thus, the sole issue with respect to this claim on appeal is whether Pladsen was acting as an agent of the state when he elicited incriminating statements from the defendant.

''It is well settled that, [w]hen reviewing a trial court's denial of a motion to suppress, [a] finding of fact will not be disturbed unless it is clearly erroneous in view

State *v.* Ashby

of the evidence and pleadings in the whole record
. . . . [W]hen a question of fact is essential to the out-
come of a particular legal determination that implicates
a defendant's constitutional rights . . . and the credi-
bility of witnesses is not the primary issue, our custom-
ary deference to the trial court's factual findings is
tempered by a scrupulous examination of the record
to ascertain that the trial court's factual findings are
supported by substantial evidence." (Internal quotation
marks omitted.) *State* v. *Jacques*, 332 Conn. 271, 279,
210 A.3d 533 (2019); see also *State* v. *Swinton*, supra,
268 Conn. 855. "The issue of agency, even in a constitu-
tional context, is primarily a question of fact . . . ."
(Citations omitted.) *State* v. *Alexander*, 197 Conn. 180,
185, 496 A.2d 486 (1985). Nonetheless, to the extent
that the resolution of that question "calls for application
of the controlling legal standard to the historical facts,"
it "presents a . . . question of law . . . which [this
court reviews] de novo."[19] (Internal quotation marks

---

[19] We note that this approach is consistent with the standard of review
applied to the agency prong of *Massiah* by the majority of the federal courts
of appeals. See, e.g., *United States* v. *Ocean*, 904 F.3d 25, 33 (1st Cir. 2018)
("We review the trial judge's findings of fact for clear error . . . . We review
de novo [the] constitutional conclusion based on the facts as the trial judge
found them." (Citation omitted.)), cert. denied sub nom. *Mitchell* v. *United
States*, U.S. , 139 S. Ct. 931, 202 L. Ed. 2d 656 (2019), and cert. denied,
U.S. , 139 S. Ct. 1362, 203 L. Ed. 2d 596 (2019); *United States* v.
*Birbal*, 113 F.3d 342, 345 (2d Cir.) ("review[ing] the [D]istrict [C]ourt's
conclusions as to constitutional violations de novo, and its findings of fact
for clear error"), cert. denied, 522 U.S. 976, 118 S. Ct. 433, 139 L. Ed. 2d
333 (1997); *United States* v. *O'Dell*, Docket No. 95-1069, 1995 WL 765231,
*3 (7th Cir. December 27, 1995) (decision without published opinion, 73
F.3d 364 (7th Cir. 1995)) ("we conclude as a matter of law that [the informant]
acted as a government agent when he spoke to [the defendant]"); *United
States* v. *Brink*, 39 F.3d 419, 421 (3d Cir. 1994) ("[w]e apply plenary review
to the [D]istrict [C]ourt's application of legal precepts . . . and clearly erro-
neous review to its factual findings" (citation omitted)); *United States* v.
*Johnson*, 4 F.3d 904, 910 (10th Cir. 1993) (reviewing District Court's conclu-
sion on agency "under the clearly erroneous standard with respect to the
underlying factual issues but de novo with respect to the ultimate constitu-
tional issue"), cert. denied, 510 U.S. 1123, 114 S. Ct. 1082, 127 L. Ed. 2d 398
(1994), and cert. denied sub nom. *Carroll* v. *United States*, 510 U.S. 1123, 114

State *v.* Ashby

omitted.) *State* v. *Castillo*, 329 Conn. 311, 322–23, 186 A.3d 672 (2018). Such a review "is not limited to the facts the trial court actually found in its decision on the defendant's motion to suppress. Rather, [this court] may also consider undisputed facts established in the record, including the evidence presented at trial." Id., 340 (*D'Auria, J.*, dissenting). "[I]n particular, [this court] must take account of any undisputed evidence that does not support the trial court's ruling in favor of the state but that the trial court did not expressly discredit." *State* v. *Edmonds*, 323 Conn. 34, 39, 145 A.3d 861 (2016).

"[T]he United States Supreme Court has held that a state violates the sixth amendment when, acting through an undisclosed agent, it 'deliberately elicit[s]' incriminating statements from an accused 'after he [has] been indicted' and his right to counsel has attached." *State*

S. Ct. 1081, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Nottingham* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994); *United States* v. *Surridge*, 687 F.2d 250, 252 (8th Cir.) ("Some courts have called the determination of whether a person is a government informant or agent a factual determination. . . . We agree that the determination as to the relationship or understanding between the police and the informant is a factual determination. However, beyond this factual determination there is a legal question: whether the relationship or understanding as found by the [D]istrict [C]ourt is such that the informant's questioning has to be considered government interrogation for constitutional examination." (Citations omitted; footnote omitted.)), cert. denied, 459 U.S. 1044, 103 S. Ct. 465, 74 L. Ed. 2d 614 (1982). But see *United States* v. *Li*, 55 F.3d 325, 328 (7th Cir. 1995); *United States* v. *Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982); *United States* v. *Van Scoy*, 654 F.2d 257, 261 (3d Cir.), cert. denied, 454 U.S. 1126, 102 S. Ct. 977, 71 L. Ed. 2d 114 (1981).

The concurring and dissenting justice contends that this court's observation in *State* v. *Alexander*, supra, 197 Conn. 185, that agency is "primarily a question of fact" compels the application of the substantial evidence standard of review to the trial court's ultimate conclusion on the question of agency. This court, however, also has characterized the deliberate elicitation prong in a similar manner. See *State* v. *Swinton*, supra, 268 Conn. 856 ("[t]he second issue of fact is whether [the informant] 'deliberately elicited' the defendant's statements"). Cases from the United States Supreme Court leave little room for doubt that questions of law abound in that context. In *United States* v. *Henry*, 447 U.S. 264, 268–69, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), for example, the court did not even mention, much less afford deference to, the trial court's ultimate conclusion on the question of deliberate elicitation.

State *v.* Ashby

v. *Swinton*, supra, 268 Conn. 855, quoting *Massiah* v. *United States*, supra, 377 U.S. 206. The general nature of this constitutional duty is clear: "[T]he [s]tate [has] an *affirmative obligation* to respect and preserve the accused's choice to seek [the] assistance [of counsel]." (Emphasis added.) *Maine* v. *Moulton*, 474 U.S. 159, 171, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985).[20]

Cases from the United States Supreme Court establishing this line of sixth amendment jurisprudence do not directly address the question of agency. A review of those decisions does, however, provide necessary context. In *Massiah* v. *United States*, supra, 377 U.S. 202–203, law enforcement officers installed a radio transmitter inside of a vehicle belonging to a cooperating codefendant. While the defendant in that case was free on bail, he made incriminating statements inside of the vehicle that were later admitted into evidence over his objection at trial. Id., 203. The Supreme Court concluded that these facts amounted to an indirect interrogation and that federal agents, therefore, had violated the sixth amendment.[21] Id., 206.

---

[20] The concurring and dissenting justice concludes that this precept is irrelevant to the question of agency under *Massiah* because that precise issue was not disputed in *Moulton*. See footnote 9 of the concurring and dissenting opinion. We, however, agree with those federal courts of appeals that read this language as a broader, guiding principle in this unique constitutional context and, accordingly, decline to cabin its import to cases examining deliberate elicitation. See *Ayers* v. *Hudson*, 623 F.3d 301, 316 (6th Cir. 2010); *United States* v. *Johnson*, 4 F.3d 904, 912 (10th Cir. 1993), cert. denied, 510 U.S. 1123, 114 S. Ct. 1082, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Carroll* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Nottingham* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994).

[21] In reaching this conclusion, the United States Supreme Court rejected an argument that the statements should be admissible because the police were merely fulfilling their duty to continue an investigation. *Massiah* v. *United States*, supra, 377 U.S. 206. Although the court recognized that such continuing investigations may be proper, it nonetheless concluded that the defendant's own incriminating statements "could not constitutionally be used by the prosecution as evidence against *him* at his trial." (Emphasis in original.) Id., 207.

State *v.* Ashby

Like the present case, *United States* v. *Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), involves government interactions with a jailhouse informant. In that case, federal law enforcement officers contacted an inmate who previously had been paid for providing information. Id., 266, 270. That informant indicated that he had been assigned to the same cellblock as the defendant and several other federal prisoners. Id., 266. "The [officer] told him to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or [to] question [the defendant] regarding the [crime at issue]." Id. Notwithstanding these instructions, the informant subsequently engaged the defendant in a series of conversations about the crime at issue, which caused the defendant to make certain incriminating statements. Id., 267. The informant recounted those statements at trial, and the defendant subsequently was convicted. Id. The government argued on appeal that, although the informant had asked the defendant questions, no sixth amendment violation occurred because the informant had disobeyed instructions. Id., 269–71. The Supreme Court rejected that argument, concluding that, because of the informant's history and proximity to the defendant, the officer "must have known that such propinquity likely would lead to that result." Id., 271. The court then recounted "the powerful psychological inducements" attendant to confinement: "[T]he mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover [g]overnment agents." Id., 274. On these grounds, the court concluded that the government had violated the defendant's constitutional rights by "intentionally creating a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel . . . ."[22] Id., 274.

--------

[22] Justice Blackmun authored a vigorous dissent asserting that the majority effectively had ignored the fact that the informant had been explicitly instructed *not* to ask any questions and that, by using phrases such as " 'must

State *v.* Ashby

Finally, in *Maine* v. *Moulton*, supra, 474 U.S. 159, a cooperating codefendant wore a wire to a meeting requested by the defendant. Id., 164. As in *Henry*, the informant was affirmatively instructed not to question the defendant. Id., 165. Notwithstanding that instruction, the informant prompted the defendant to make certain incriminating statements. Id., 166. Some of those statements were admitted at trial, and the defendant subsequently was convicted. Id., 167. Before examining the facts of the case before it, the court characterized the right at issue as follows: "Once the right to counsel has attached and been asserted, the [s]tate must of course honor it. This means more than simply that the [s]tate cannot prevent the accused from obtaining the assistance of counsel. The [s]ixth [a]mendment also imposes on the [s]tate an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the [s]tate's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel."[23] (Footnote omitted.) Id., 170–71.

In *Moulton*, the state advanced an argument on appeal that the sixth amendment had not been violated because the meeting had been initiated by the defendant rather than by the state. Id., 174. The Supreme Court rejected that argument, concluding that the defendant

have known' " and " 'likely,' " the majority had "fundamentally restructure[d]" *Massiah* to include even " 'negligent' " elicitation. *United States* v. *Henry*, supra, 447 U.S. 278–80 (Blackmun, J., dissenting).

[23] Indeed, the court asked, "what use is a defendant's right to effective counsel at every stage of a criminal case if, while he is held awaiting trial, he can be questioned in the absence of counsel until he confesses?" (Internal quotation marks omitted.) *Maine* v. *Moulton*, supra, 474 U.S. 171, quoting *Spano* v. *New York*, 360 U.S. 315, 326, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959) (Douglas, J., concurring).

State *v.* Ashby

had an affirmative right "to rely on counsel as a 'medium' between him and the [s]tate." Id., 176; see also id., 170–71 n.6. Thus, the court concluded that "knowing exploitation by the [s]tate of an opportunity to confront the accused without counsel being present is as much a breach of the [s]tate's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the [s]ixth [a]mendment is violated when the [s]tate obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." Id., 176. As it had in *Henry*, the court then held that this standard had been met, concluding that, in light of the undisputed facts, the state "must have known" that the informant would elicit incriminating statements. Id., 177.

Some general principles can be drawn from these Supreme Court cases. First, although the state's affirmative obligation primarily requires it to refrain from taking action, it does not follow that a court conducting a sixth amendment analysis must ignore opportunities for the state that came to pass by chance. Thus, the court found a constitutional violation in *United States* v. *Henry*, supra, 447 U.S. 268, even though the informant's housing in the same cellblock as the defendant in that case had not been prearranged by the government. The fact that the defendant requested the meeting in *Maine* v. *Moulton*, supra, 474 U.S. 174–76, likewise did not preclude a constitutional violation. Second, because of the pressures attendant to physical custody, the risk of infringement of the right to counsel is more acute in the jailhouse setting. See *United States* v. *Henry*, supra, 274. Third, a rule requiring direct proof that the government knowingly violated the defendant's right to counsel sets the bar too high to protect that right. See *Maine* v. *Moulton*, supra, 176 n.12; see also *State* v. *Diaz*, 302 Conn. 93, 120, 25 A.3d 594 (2011) (*Palmer, J.*, concur-

State *v.* Ashby

ring) ("[I]t is difficult for a defendant to demonstrate the existence of an 'implicit understanding' between the state and an informer that the latter will, in fact, receive a benefit for his or her testimony. In fact, it is likely to be *impossible* for the defendant to demonstrate the existence of such an understanding between the state and its witness." (Emphasis in original.)). It will suffice to show that, in light of the totality of the circumstances, the state "must have known" that its actions likely would lead to the deliberate elicitation of incriminating statements.[24] *United States* v. *Henry*, supra, 271.

Although these United States Supreme Court cases explored the bounds of deliberate elicitation, lower courts examining the question of agency—including this court—have frequently looked to those decisions for guidance. See, e.g., *State* v. *Alexander*, supra, 197 Conn. 184; see also *Ayers* v. *Hudson*, 623 F.3d 301, 310–16 (6th Cir. 2010) (applying "must have known" standard from *Henry* and invoking state's affirmative obligation from *Moulton* in case in which deliberate elicitation was conceded by governemnt); *Randolph* v. *People*, 380 F.3d 1133, 1144 (9th Cir. 2004) ("*Henry* makes clear that it is not the government's intent or overt acts that

_____

[24] We agree with the concurring and dissenting justice that the state's foreknowledge of deliberate elicitation is alone insufficient to give rise to an agency relationship. Simply put, such a test could result in a constitutional violation without any state action. See *State* v. *Marshall*, 882 N.W.2d 68, 91 (Iowa 2016), cert. denied,    U.S.    , 137 S. Ct. 829, 197 L. Ed. 2d 68 (2017). We emphasize that some action by the state is always required in this context; the question of whether such actions suffice to create an agency relationship, in turn, must be determined by examining whether, in light of the surrounding context, the state must have known that its own conduct was likely to result in an infringement of the defendant's sixth amendment right to counsel. See *Ayers* v. *Hudson*, 623 F.3d 301, 311 (6th Cir. 2010) ("[i]t is not the government's intent or overt acts that are important; rather, it is the likely . . . result of the government's acts" (internal quotation marks omitted)). In cases in which the state chooses to act, its affirmative obligation requires it to do so in a manner that "respect[s] and preserve[s] the accused's choice to seek [the] assistance [of counsel]." *Maine* v. *Moulton*, supra, 474 U.S. 171.

State *v.* Ashby

are important; rather, it is the 'likely . . . result' of the government's acts''); *Matteo* v. *Superintendent, SCI Albion*, 171 F.3d 877, 895 (3d Cir.) (applying intentional creation standard from *Henry* to question of agency), cert. denied sub nom. *Matteo* v. *Brennan*, 528 U.S. 824, 120 S. Ct. 73, 145 L. Ed. 2d 62 (1999); *United States* v. *Johnson*, 4 F.3d 904, 912 (10th Cir. 1993) (applying '' 'affirmative obligation' '' standard from *Moulton* to question of agency), cert. denied, 510 U.S. 1123, 114 S. Ct. 1082, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Carroll* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Nottingham* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994); *Depree* v. *Thomas*, 946 F.2d 784, 796 (11th Cir. 1991) (applying ''must have known'' standard from *Henry* to question of agency); *Thomas* v. *Cox*, 708 F.2d 132, 136 (4th Cir.) (''The point at which agency—hence proper attribution—for this purpose arises out of a government-citizen relationship is not subject to any bright-line test. But we think a general benchmark can be derived from *Henry*, [in which] the agency question did figure in the [c]ourt's factual analysis.''), cert. denied, 464 U.S. 918, 104 S. Ct. 284, 78 L. Ed. 2d 262 (1983).[25]

The United States Supreme Court has yet to articulate a test for determining agency under *Massiah*. Other

[25] The concurring and dissenting justice's reliance on *Cox* to support the proposition that *Henry* is irrelevant to the question of agency is, therefore, inapt. It is also worth noting that, although the concurring and dissenting justice is correct that a case from the United States Court of Appeals for the Fifth Circuit has declined to adopt language from *Henry* as governing the question of agency, the precise passage that court declined to engraft looks very similar to the test proposed by the concurring and dissenting justice. See *Creel* v. *Johnson*, 162 F.3d 385, 393 (5th Cir.1998) (''[C]iting to [*Henry*], [the defendant] argues that we should consider whether [the informant] 'was charged with the task of obtaining information from an accused.' *Henry* involved . . . a clear case of agency, and the [c]ourt only considered if the agent [was] 'charged with the task of obtaining information from an accused' to determine whether the agent 'deliberately elicited' the information. [The defendant's argument fails because] the agency inquiry is precedent to and distinct from determining whether an agent 'deliberately elicits' information.'').

State *v.* Ashby

courts, however, have confronted that question directly.
Decisions of this court, in particular, provide some ini-
tial instruction in this regard. "There is no [bright-line]
test for determining when a private citizen is acting as
an agent of the police." *State* v. *Alexander*, supra, 197
Conn. 183. "The existence of an agency relationship
. . . turns upon a number of factual inquiries into the
extent of police involvement with the informant. Those
inquiries include the following: whether the police have
promised the informant a reward for his cooperation
or whether he is self-motivated . . . whether the police
have asked the informant to obtain incriminating evi-
dence and placed him in a position to receive it . . .
and whether the information is secured as part of a
government initiated, [preexisting] plan." (Internal quo-
tation marks omitted.) *State* v. *Swinton*, supra, 268
Conn. 855–56; accord *State* v. *Marshall*, 882 N.W.2d 68,
91 (Iowa 2016) ("[I]t seems clear . . . that agency
under *Massiah* does not rely too heavily on traditional
principles of private contract or agency law, but instead
seems closer to the doctrine of state action. The ques-
tion, for constitutional purposes, is whether the actions
of an informant may be fairly attributed to the state."),
cert. denied,      U.S.      , 137 S. Ct. 829, 197 L. Ed. 2d
68 (2017).

The facts underlying *State* v. *Swinton*, supra, 268
Conn. 781, serve as a useful starting point. In that case,
a jailhouse informant, who previously had provided
information to the police in unrelated cases, overheard
the defendant making death threats against certain wit-
nesses. Id., 852–53. The informant later met with the
police, told them about the defendant's statements, and
entered into a formal agreement with the state to serve
as a " 'listening post.' " Id., 853. After the informant
returned to prison, the defendant made further incrimi-
nating statements. Id. The trial court found that the nature
of the informant's relationship had changed when he

State *v.* Ashby

entered into a formal agreement with the police. Id.,
853–54. Specifically, the trial court found that, before
the meeting, there was "no evidence whatsoever that
the police had instructed [the informant] to gather infor-
mation about [the defendant's] case, about crimes in
general, or about any other case in particular, nor [was]
there any evidence that the police had indicated to [the
informant] that he would be rewarded in any way by
providing information . . . ." (Internal quotation
marks omitted.) Id., 857. This court agreed, noting that,
although the informant had assisted the police pre-
viously and "had some expectation that he would bene-
fit from providing information . . . there was no evi-
dence that the government had directed or steered the
informant toward the defendant." Id., 858. Neither the
trial court in that case nor this court, however, had any
difficulty concluding that the informant was a govern-
ment agent after entering into a formal agreement with
the state.[26] Id., 859.

[26] In *State* v. *Swinton*, supra, 268 Conn. 855, we cited a previous decision
of this court, *State* v. *Alexander*, supra, 197 Conn. 185, for the applicable
legal standard governing the question of agency. In *Alexander*, this court
concluded that there was substantial evidence to support the trial court's
factual finding that an agency relationship was absent when the police drove
a private citizen who lacked a driver's license to meet with the defendant
in jail on two occasions. Id., 186–87. Although our decision in that case
noted some level of facilitation and encouragement by the police; id.; the
informant in that case was not incarcerated, and there was no evidence
that he actually received anything in exchange for his cooperation. Id., 187
and n.4. Finally, we note that our decision in *Alexander* predated the United
States Supreme Court's pronouncement that, under *Massiah*, the "police
have an affirmative obligation not to act in a manner that circumvents and
thereby dilutes the protection afforded by the right to counsel." *Maine* v.
*Moulton*, supra, 474 U.S. 171. In light of these distinctions, our decision in
*Alexander* is of limited utility in the present case.

A Superior Court case, *State* v. *Howell*, Superior Court, judicial district
of New Britain, Docket No. CR-05-222048-S (January 30, 2007) (*Sheldon*,
*J.*), contains a more instructive set of facts. In that case, the defendant was
arrested, charged with murder, and held in lieu of bond. Id. The informant
in that case, a fellow inmate, began interacting with the defendant in the
prison recreation area. Id. During a series of conversations there, the defen-
dant remarked that his charges related to the disappearance of a prostitute
and made certain incriminating statements. Id. The informant subsequently
called the police to discuss the defendant, and a detective asked, in particu-

State *v.* Ashby

Cases from other jurisdictions help to draw the line
between entrepreneur and agent more precisely. The
United States Court of Appeals for the Second Circuit,[27]
for example, has held that "[a]n informant becomes a
government agent vis-à-vis a defendant when the infor-
mant is instructed by the police to get information about
[that] particular defendant." (Internal quotation marks

lar, if the defendant had said anything about the body. Id. The informant
responded that, although the defendant had not said anything yet, the conver-
sations would likely " 'lead up to that.' " Id. The detective affirmatively
instructed the informant not to press the defendant for information but
also implied that the informant should continue listening, stating: "[I]f [the
defendant's] offering shit you know just." Id. The informant then returned
to the recreation area and elicited further incriminating statements from
the defendant. Id.

The detective spoke to the informant again the following day. "This conver-
sation began with a lengthy lecture by the [d]etective to [the informant]
about the legal consequences of his continuing cooperation with the investi-
gation in light of the fact that the defendant was formally charged with
murder and had an attorney appointed to represent him. According to the
[d]etective, [the informant] had become an agent of the [s]tate with respect
to the police investigation of [the] death and disappearance [of the victim]
when they first spoke on the telephone the day before. Thus, the [d]etective
told him, he could not ask the defendant any questions on the subject of
[the victim] . . . and he could not agree with the defendant, or even nod
his head, if the defendant ever spoke about her." (Citation omitted.) Id. At
trial, the state sought to admit the incriminating statements made by the
defendant both before and after the informant's first contact with the
police. Id.

The trial court in that case concluded that, notwithstanding certain evi-
dence indicating that the informant had provided information to the police
regarding certain other cases, there was no evidence of an agency relation-
ship before the first telephone call. Id. The trial court also found, however,
that an agency relationship had been established when, "upon completing
his short phone call . . . [with] the [d]etective . . . and learning that the
[d]etective was very interested in what the defendant might ultimately tell
him, [the informant] returned to the recreation area to hear whatever else
the defendant was ready to say." Id. The trial court opined that the detective's
admonition not to " 'press' " the defendant was "a far cry from the express
and appropriate warnings" given the following day and that the informant's
actions after the first telephone call amounted to deliberate elicitation. Id.
Accordingly, the trial court in that case suppressed the evidence regarding
the statements made by the defendant after the informant's first contact
with the police. Id.

[27] Because this issue relates to a question arising under the federal constitu-
tion, case law from the Second Circuit is entitled to significant weight. See,
e.g., *Gleason* v. *Smolinski*, 319 Conn. 394, 444 n.41, 125 A.3d 920 (2015).

State *v.* Ashby

omitted.) *United States* v. *Whitten*, 610 F.3d 168, 193 (2d Cir. 2010); see also *United States* v. *LaBare*, 191 F.3d 60, 65 (1st Cir. 1999); *Moore* v. *United States*, 178 F.3d 994, 999 (8th Cir.), cert. denied, 528 U.S. 943, 120 S. Ct. 356, 145 L. Ed. 2d 278 (1999).[28]

Other courts have looked at the government's relationship with the informant more broadly and examined the record for, among other things,[29] evidence of promises or the provision of some benefit. See *Thompson* v. *Davis*, 916 F.3d 444, 455 (5th Cir. 2019) ("[t]o determine whether an informant was a government agent for purposes of a *Massiah* claim, the court asks whether the informant was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant . . . and whether he acted pursuant to instructions from the [s]tate, or otherwise submitted to the [s]tate's control"); *United States* v. *Johnson*, supra, 4 F.3d 910–11 (agency may be supported by express or implied quid pro quo); see also *Ayers* v. *Hudson*, supra, 623 F.3d 311 ("although direct written or oral instructions by the [s]tate to a jailhouse informant to obtain evidence from a defendant would be sufficient to demonstrate agency, it is not the only relevant factor"); *Depree* v. *Thomas*, supra, 946 F.2d

---

[28] Although this approach has been described as a bright-line rule requiring government instruction as a predicate to relief under *Massiah*; see D. Kirsch, Note, "The Prosecutor Circumvents the Sixth Amendment Right to Counsel with a Simple 'Wink and Nod,' " 69 Mo. L. Rev. 553, 560–61 (2004); its origins may be traced back to cases weighing various factors. See, e.g., *United States* v. *Birbal*, 113 F.3d 342, 346 (2d Cir.), cert. denied, 522 U.S. 976, 118 S. Ct. 433, 139 L. Ed. 2d 333 (1997); *Stano* v. *Butterworth*, 51 F.3d 942, 977 (11th Cir. 1995), cert. denied sub nom. *Stano* v. *Singletary*, 516 U.S. 1122, 116 S. Ct. 932, 133 L. Ed. 2d 859 (1996); *Brooks* v. *Kincheloe*, 848 F.2d 940, 944–45 (9th Cir. 1988).

[29] For largely pragmatic reasons, courts have often hesitated to articulate an exhaustive list of factors in this context. See, e.g., *People* v. *Cardona*, 41 N.Y.2d 333, 335, 360 N.E.2d 1306, 392 N.Y.S.2d 606 (1977) ("we decline to subscribe to any ironclad rules as to when agency exists since the niceties of rule-complying form could easily mask the substance of a true agency relationship").

State *v.* Ashby

793–94 ("[t]here is, by necessity, no bright-line rule for determining whether an individual is a government agent for purposes of the sixth amendment right to counsel").

Courts have reached a general consensus that an agency relationship may be established through either implicit or explicit conduct. See *State* v. *Marshall*, supra, 882 N.W.2d 91 (citing cases). Indeed, requiring a defendant to produce admissible evidence of an explicit agreement, promise, or instruction as a predicate to relief would substantially diminish the protections afforded under *Massiah*. See *Ayers* v. *Hudson*, supra, 623 F.3d 312 ("[t]o hold otherwise would allow the [s]tate to accomplish 'with a wink and a nod' what it cannot do overtly"). Requiring proof of formal arrangements is also in tension with the affirmative obligation to protect a defendant's right to counsel imposed by the United States Supreme Court. See *Maine* v. *Moulton*, supra, 474 U.S. 171.

The trial court in the present case correctly determined that the record does not evince an express or formal agreement between Pladsen and Weaver. However, this is also not a case in which the state met with a jailhouse informant only *after* the incriminating statements had been elicited. See, e.g., *State* v. *Swinton*, supra, 268 Conn. 857. Accordingly, we must determine whether Pladsen's conduct after meeting with Weaver was, in light of all the facts presented, fairly attributable to the state. See *United States* v. *Henry*, supra, 447 U.S. 270; *State* v. *Marshall*, supra, 882 N.W.2d 91. Although the question is a close one in this case, we believe that, on balance, Pladsen's efforts to procure incriminating statements from the defendant during the course of the underlying trial were not the result of mere "luck or happenstance . . . ." *Maine* v. *Moulton*, supra, 474 U.S. 176. Rather, we conclude that those efforts are fairly attributable to the state.

State *v.* Ashby

First, the meeting between Pladsen and Weaver placed a significant emphasis on what useful information Pladsen might obtain as the result of his future assistance. Indeed, Pladsen did not convey any information of importance to Weaver during their initial meeting at Northern. Instead, the two discussed the possibility that Pladsen could elicit, and perhaps record, *additional* incriminating statements from the defendant at some later point in time. Although the state is correct to note that Weaver conditioned any formal plans on approval by the Office of the State's Attorney, the content of this particular conversation indicates, at the very least, that the prospect of such assistance would be considered.

Second, the meeting at Northern appears to have focused Pladsen's efforts on producing a particular type of evidence. Pladsen's letter to Weaver offered to provide information against the defendant but referenced only unrelated criminal charges.[30] During the meeting that followed, Weaver and Pladsen expressly discussed the defendant's involvement in the victim's death. Weaver asked Pladsen if he would be comfortable wearing a wire, plainly stated that the police were "always interested" in verifiable information from reliable sources, and then left Pladsen with his contact information. In this context, one could readily infer that the state was principally interested in objectively verifiable forms of evidence regarding the defendant's involve-

---

[30] The concurring and dissenting justice contests this reading. See footnote 22 of the concurring and dissenting opinion. This letter, which was marked as an exhibit for identification purposes, provides in relevant part: "I have some information that could be very useful to you and one of your cases. . . . I know all about Nashon and Valentino and so on. . . . You want my help, come [and] see me [and] we'll talk. . . ." Nashon and Valentino are individuals related to a different criminal case then pending against the defendant. Indeed, as the trial court in the present case itself noted, "the initial letter was not about [the victim]; [Pladsen] wanted to give information about [the defendant's] other crimes."

State *v.* Ashby

ment in this particular case, such as a recording or writing. Although Weaver made no explicit requests during this meeting, the handwritten note that Pladsen ultimately produced during the state's case-in-chief mirrored those requirements precisely.[31]

Third, Pladsen clearly sought assurance from Weaver that a benefit would be made available in exchange for his cooperation. See footnote 11 of this opinion. Weaver said that he could not personally make any promises, but his response (1) informed Pladsen that the Office of the State's Attorney would have to approve any "deals," and (2) made Pladsen "generally aware" of the fact that "any information received" would be conveyed to the Office of the State's Attorney. Weaver said that he would be willing to listen to anything Pladsen had to say, and Pladsen said that he understood. Although Weaver did not connect these dots in explicit terms, the presence of such express language is not necessarily required for the reasons stated previously. See *State* v. *Arroyo*, 292 Conn. 558, 568, 973 A.2d 1254 (2009) ("the expectation of a [r]eward for testifying is a systemic reality . . . even where the informant has not received an explicit promise of a reward" (citation omitted; internal quotation marks omitted)), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010); see also *McBeath* v. *Commonwealth*, 244 S.W.3d 22, 33–34 (Ky. 2007) (there was some evidence that informant acted with expectation of future benefit when officer responded to infor-

_____

[31] Although it is not entirely clear from the record whether Pladsen expressly indicated that he would be continuing his efforts to obtain information from the defendant; see footnote 12 of this opinion; that fact would have become apparent to the state no later than May 29, 2007, the day the note was given to Weaver. Pladsen's testimony at trial indicates that, notwithstanding this fact, the defendant was returned to Northern later that same day where he made *additional* incriminating statements to Pladsen. Specifically, Pladsen testified at trial that the defendant was upset that the state had found the note and had asked him to claim authorship. See footnotes 14 and 16 of this opinion.

State *v.* Ashby

mant's inquiry by stating " '[t]hat's up to the prosecutor' ").

The fact that the state did not object to Pladsen's attempt to pursue a modification of his twenty-five year sentence is also relevant.[32] As we noted previously, Pladsen's testimony indicates that this precise exchange was discussed during his meeting with Weaver at Northern. Indeed, the state does not appear to contest that, as a factual matter, Pladsen ultimately was permitted to seek a sentence modification as the result of his assistance in the present case. Although Pladsen's efforts in that regard ultimately proved unsuccessful, the state's forbearance of its unilateral right to veto such a proceeding in its entirety pursuant to § 53a-39 (b) provided something objectively valuable in exchange for Pladsen's cooperation. Cf. *United States* v. *Brink*, 39 F.3d 419, 423 n.5 (3d Cir. 1994). In the sixth amendment context, the provision of such an actual benefit in exchange for an informant's cooperation serves as at least some evidence of agency. See *United States* v. *Johnson*, supra, 4 F.3d 910–11; *United States* v. *York*, 933 F.2d 1343, 1358 (7th Cir.) (overruled on other grounds by *Wilson* v. *Williams*, 182 F.3d 562 (7th Cir. 1999)), cert. denied, 502 U.S. 916, 112 S. Ct. 321, 116 L. Ed. 2d 262 (1991); *United States* v. *Surridge*, 687 F.2d 250, 254 (8th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 465, 74 L. Ed. 2d 614 (1982).

Finally, the sixth amendment concerns in the present case must be viewed in light of the defendant's confinement. As the United States Supreme Court has noted, "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influ-

---

[32] We note that the record contains some evidence indicating that the state had expressly agreed to permit a sentence modification shortly before Pladsen testified in the present case. See footnote 17 of this opinion. The trial court, however, declined to find that evidence to be credible in ruling on a related postjudgment claim.

State *v.* Ashby

ences that will make him particularly susceptible to the ploys of undercover [g]overnment agents.'' *United States* v. *Henry*, supra, 447 U.S. 274; see *Matteo* v. *Superintendent, SCI Albion*, supra, 171 F.3d 895; see also *Illinois* v. *Perkins*, 496 U.S. 292, 307, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990) (Marshall, J., dissenting) (''Custody works to the [s]tate's advantage in obtaining incriminating information. The psychological pressures inherent in confinement increase the suspect's anxiety, making him likely to seek relief by talking with others.''). In this context, ''the government has long been on notice that the use of prison informants risks treading on the constitutional rights of an accused . . . .'' *United States* v. *Stevens*, 83 F.3d 60, 65 (2d Cir.), cert. denied, 519 U.S. 902, 117 S. Ct. 255, 136 L. Ed. 2d 181 (1996).[33]

To summarize, Weaver met with Pladsen and expressed an interest in obtaining verifiable evidence of incriminating statements from this particular defendant regarding this particular case. Although there was no ''agreement,'' ''contract,'' ''mutual understanding,'' or ''meeting of the minds,'' the two expressly discussed Pladsen's desire for a benefit in exchange for his cooperation in the present case, and, in fact, the state actually provided

---

[33] The concurring and dissenting justice concludes that the defendant's incarceration ''is simply not relevant to the question of whether Pladsen was an agent of the state.'' We recognize that a circuit split exists on this particular point of law and that, as a result, the position of the concurring and dissenting justice is supported by relevant case law. Compare *Matteo* v. *Superintendent, SCI Albion*, supra, 171 F.3d 895 (concluding that, ''[c]ertainly, the 'special pressures' of custody were present''), with *United States* v. *Watson*, 894 F.2d 1345, 1347 (D.C. Cir. 1990) (''it is of no moment that the incriminating conversations took place while the accused was incarcerated''). Nonetheless, we disagree. The circumstances attendant to the defendant's incarceration, such as the undisputed fact that he recreated alone with Pladsen, must be considered when evaluating the ''likely . . . result of the government's acts.'' (Internal quotation marks omitted.) *Ayers* v. *Hudson*, supra, 623 F.3d 311. As a result, we find the reasoning of the United States Court of Appeals for the Third Circuit in *Matteo*, on balance, more persuasive.

State *v.* Ashby

such a benefit to Pladsen after the desired evidence was produced. Although the record does not evince any particular "plan" or "instruction," Weaver knew from the initial letter that Pladsen had strong incentives to cooperate as the result of his incarceration and consecutive sentences, had already gained the defendant's trust, and was in a uniquely strong position to question the defendant at length. After Weaver told Pladsen that he was interested in hearing new evidence relating to the victim's death—by, for example, suggesting the use of a wire—additional control would have been superfluous. We conclude that the state either knew or should have known that such a conversation was likely to end in further deliberate elicitation.[34]

Notwithstanding the eventual likelihood of such efforts by Pladsen, very little was done to protect the defendant's sixth amendment rights. During the meeting at Northern, Weaver could have expressly instructed Pladsen to cease deliberately eliciting information from the defendant or to avoid conversations regarding the present case until the Office of the State's Attorney could provide guidance on how to proceed. Although the Office of the State's Attorney ultimately instructed Weaver not to pursue this avenue, that fact was never communicated to Pladsen. Weaver's general admonition that any plans or deals would have to be formally approved, the impact of which is unclear; see footnote 12 of this opinion; was "a far cry from the express

---

[34] Even if Pladsen's initial private meeting with Weaver did not result in agency, surely, such a relationship would have been established after Pladsen offered, and the state affirmatively accepted, evidence specifically relating to the defendant's involvement in the victim's death. It is undisputed, however, that Pladsen was returned to Northern after producing the note, had another conversation with the defendant about the present case, and was subsequently called by the state to testify as to that conversation. See footnotes 14, 16 and 31 of this opinion. Because the state has conceded both deliberate elicitation and harmless error in the present appeal, this fact alone would have been sufficient to warrant reversal of the defendant's conviction.

336 Conn. 452 APRIL, 2021 485

State *v.* Ashby

and appropriate warnings'' that should have been given. *State* v. *Howell*, Superior Court, judicial district of New Britain, Docket No. CR-05-222048-S (January 30, 2007) (*Sheldon, J.*).[35] On the basis of the record presently before us, we simply cannot conclude that the state has satisfied its affirmative obligation under *Massiah* and its progeny to respect and preserve the defendant's invocation of his constitutional right to counsel. See *Maine* v. *Moulton*, supra, 474 U.S. 171.

The trial court's remaining findings of historical fact do not alter this analysis. Although Pladsen was housed with the defendant by chance, that same fact was of no moment in *United States* v. *Henry*, supra, 447 U.S. 268. Likewise, the fact that Pladsen initiated contact with the police does not diminish the possibility that the state subsequently took advantage of the opportunity that contact created. See *Maine* v. *Moulton*, supra, 474 U.S. 176 (''knowing exploitation by the [s]tate of an opportunity to confront the accused without counsel being present is as much a breach of the [s]tate's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity''). Finally, although the defendant's subjective knowledge that Pladsen was speaking with Weaver may be relevant to an analysis of waiver; see *United States* v. *Henry*, supra, 273; the question of agency must be resolved by an examination of the facts relating to the nature of the relationship between the state and the defendant's interrogator.[36]

---

[35] Although the presence of such prophylactic steps does not necessarily preclude sixth amendment infirmity; *Maine* v. *Moulton*, supra, 474 U.S. 165; *United States* v. *Henry*, supra, 447 U.S. 266–67; the state's failure to employ these measures in the present case undoubtedly increased the likelihood of infringement of the defendant's constitutional rights.

[36] To conclude otherwise would allow jailhouse informants to exclude themselves from consideration as a state actor simply by pretending to be a double agent. The fact that a defendant who falls victim to such a ruse may himself be seeking to gain some measure of unfair advantage is irrelevant. The state's affirmative obligation to avoid infringement of the right to counsel precludes such gamesmanship. See *Maine* v. *Moulton*, supra, 474 U.S. 171.

State *v.* Ashby

For the foregoing reasons, we conclude that a scrupulous examination of the undisputed facts contained within the record of the present case establishes that the defendant has satisfied his burden of demonstrating the existence of an agency relationship under *Massiah*. The trial court's denial of the motion to suppress Pladsen's testimony was, therefore, improper. As a result, the defendant is entitled to a new trial.

II

The defendant next claims that there is insufficient evidence that he had "remain[ed] unlawfully" in the victim's apartment, as required to sustain a conviction on the charge of burglary in the first degree under General Statutes (Rev. to 2001) § 53a-101 (a) (2).[37] The defendant's sole argument in support of this claim is that *State* v. *Allen*, 216 Conn. 367, 382, 579 A.2d 1066 (1990), should be overruled because it "impermissibly merges the [element] of remaining unlawfully and the intent to commit a crime" by holding that proof of any indoor criminal act satisfies both elements. The state agrees with the defendant's reading of *Allen* but nevertheless argues that its holding should be allowed to stand as settled law. We conclude, however, that the holding of that case stands for the far narrower proposition that the state may prove an unlawful remaining by producing evidence that a defendant has engaged in conduct that was likely to terrorize occupants. *State* v. *Allen*, supra, 382–84. For the reasons that follow, we decline the defendant's invitation to overrule that holding.

Although this claim is framed as a question of evidentiary sufficiency, the issue presented relates to the proper construction of this state's burglary statutes and, more particularly, the scope of the phrase "enters or

---

[37] We address this claim because it seeks relief in the form of a judgment of acquittal. See, e.g., *State* v. *Padua*, 273 Conn. 138, 178–79, 869 A.2d 192 (2005).

State *v.* Ashby

remains unlawfully . . . .'' General Statutes (Rev. to
2001) § 53a-101 (a). The question of whether our con-
struction of that statutory language in *Allen* should be
overruled raises an issue of law that is subject to plenary
review. See, e.g., *State* v. *Salamon*, 287 Conn. 509, 529,
949 A.2d 1092 (2008); see also, e.g., *Spiotti* v. *Wolcott*,
326 Conn. 190, 195, 163 A.3d 46 (2017).

"The doctrine of stare decisis counsels that a court
should not overrule its earlier decisions unless the most
cogent reasons and inescapable logic require it.'' (Inter-
nal quotation marks omitted.) *Commission on Human
Rights & Opportunities* v. *Sullivan*, 285 Conn. 208, 216,
939 A.2d 541 (2008). "In evaluating the force of stare
decisis, our case law dictates that we should be espe-
cially wary of overturning a decision that involves the
construction of a statute. . . . When we construe a
statute, we act not as plenary lawgivers but as surro-
gates for another policy maker, [that is] the legislature.
In our role as surrogates, our only responsibility is to
determine what the legislature, within constitutional
limits, intended to do. Sometimes, when we have made
such a determination, the legislature instructs us that
we have misconstrued its intentions. We are bound by
the instructions so provided. . . . More often, how-
ever, the legislature takes no further action to clarify
its intentions. Time and again, we have characterized
the failure of the legislature to take corrective action
as manifesting the legislature's acquiescence in our con-
struction of a statute. . . . Once an appropriate inter-
val to permit legislative reconsideration has passed
without corrective legislative action, the inference of
legislative acquiescence places a significant jurispru-
dential limitation on our own authority to reconsider
the merits of our earlier decision.'' (Internal quotation
marks omitted.) Id., 216–17.

We begin by setting forth the relevant statutory lan-
guage. General Statutes (Rev. to 2001) § 53a-101 (a) (2)

State *v.* Ashby

provides in relevant part that "[a] person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."[38] General Statutes (Rev. to 2001) § 53a-100 (b), in turn, provides that "[a] person 'enters or remains unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so."[39]

In *State* v. *Allen*, supra, 216 Conn. 379, this court considered whether there was sufficient evidence to support a conviction of burglary in the first degree. In addressing that claim, we began by noting that the phrase "licensed or privileged" was "meant as a unitary phrase, rather than as a reference to two separate concepts." (Internal quotation marks omitted.) Id., 380.

[38] Although the operative information charged the defendant with both unlawfully entering and remaining, the state's evidence and arguments pertain solely to the latter. See *State* v. *Belton*, 190 Conn. 496, 500, 461 A.2d 973 (1983) ("[t]o enter unlawfully contemplates an entry [that] is accomplished unlawfully, [whereas] to remain unlawfully contemplates an initial legal entry [that] becomes unlawful at the time that the actor's right, privilege or license to remain is extinguished"). Indeed, the state's brief notes that, at trial, it proceeded under the theory "that, because the victim was acquainted with the defendant and because there were no signs of forced entry, [the victim] likely willingly permitted [the defendant] to enter her apartment."

[39] The trial court gave the following instructions to the jury with respect to this element: "[T]he state must prove beyond a reasonable doubt that the defendant entered unlawfully or, regardless of how the defendant entered, he remained there unlawfully. A person enters or remains unlawfully in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the defendant is not otherwise licensed or privileged to do so. It does not matter how an intruder may actually have entered; if he did so without license, he has entered unlawfully. Even if a person entered a building lawfully, that is, he had the right or had been given permission and the right had been terminated or the permission withdrawn by someone who had a right to terminate or withdraw it, you may find unlawfully remaining as the basis of burglary."

State *v.* Ashby

Drawing from a previous Appellate Court decision, we explained: "A *license* in real property is defined as a personal, revocable, and unassignable *privilege*, conferred either by writing or parol, to do one or more acts on land without possessing any interest therein." (Emphasis in original; internal quotation marks omitted.) Id., quoting *State* v. *Grant*, 6 Conn. App. 24, 29, 502 A.2d 945 (1986).

In *Allen*, the evidence showed that the defendant had entered the subject premises, a condominium, with an accomplice who had a key. *State* v. *Allen*, supra, 216 Conn. 381. The defendant was then led upstairs where the occupant of the home was tied up, unclothed, and gagged. Id., 381–82. Although the victim looked to the defendant for assistance, none was given. Id. Instead, the defendant stole some of the victim's property and watched while his accomplice choked the victim. Id., 382. On the basis of these facts, this court rejected the defendant's claim that there was insufficient evidence of an unlawful remaining. Id. Specifically, we reasoned that, "even if the defendant initially entered the victim's condominium lawfully, it is clear that consent to remain was implicitly withdrawn and thus that the [defendant] unlawfully remained within the meaning of the statute." (Internal quotation marks omitted.) Id.

In *Allen*, this court distinguished *State* v. *Thomas*, 210 Conn. 199, 204, 554 A.2d 1048 (1989), a case that involved a convenience store robbery. We indicated that the holding of *Thomas*—namely, that "a defendant does not lose his status as a member of the public by manifesting a criminal intent"—was relevant only in cases in which the premises were held " 'open to the public' " and, therefore, did "not apply to a private dwelling that requires the continued consent of its occupant."[40] *State* v. *Allen*, supra, 216 Conn. 383–84. We then reiterated that the purpose of the statutory phrase

---

[40] In *Thomas*, the state argued that the jury could have inferred an unlawful remaining from the fact that the defendant had "manifested an intent to carry out a criminal purpose" while inside of the convenience store. *State*

State *v.* Ashby

"enters or remains unlawfully" is "to make clear that only the kind of entry or remaining [that] is likely to terrorize occupants is prohibited by the crime of burglary." (Internal quotation marks omitted.) Id., 384. In *Allen*, we readily concluded that "the element of terror was present" and that "seeing the victim naked, gagged, and tied up on the floor, and seeing [his accomplice] threaten, strike and choke the victim while the victim, in terror, looked for help, all clearly indicated to the defendant that, even if there were consent for his initially entering the condominium, it had been [implicitly] withdrawn." Id.

The defendant in the present case suggests that *Allen* "conflate[s] the elements of intent and unlawful remaining." Specifically, the defendant asserts that our reasoning in that case implies that "a person's license to be on the property is revoked simply because he commits a crime inside the premises . . . ." Put differently, the defendant claims that, under *Allen*, "every person who commits a crime while inside a building also commits a burglary . . . ." The defendant argues that, instead, this court should restrict unlawful remaining to surreptitious conduct.[41] In presenting these arguments, the defendant relies on case law from other jurisdictions,

___

v. *Thomas*, supra, 210 Conn. 207. In rejecting that argument, this court relied on a comment by the Commission to Revise the Criminal Statutes, which provides in relevant part: " 'The purpose of this definition is to make clear that only the kind of entry or remaining which is likely to terrorize occupants is prohibited by the crime of burglary. Thus, when the building is, at the time, open to the public, or the actor is otherwise licensed or privileged to be there, *the element of terror* is missing and the requirement is not met.' " (Emphasis added.) Id., quoting Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes (1969) pp. 52–53, reprinted in Conn. Gen. Stat. Ann. § 53a-100 (West 2012), commission comment, p. 16.

[41] The paradigm of such an unlawful remaining occurs when a defendant enters a business when it is open to the public and then stays past closing. See *State* v. *Allen*, supra, 216 Conn. 384 ("A enters an office building during business hours—a lawful entry since the building is open to the public—and remains, perhaps hidden, after the building is closed, with intent to steal. A is guilty of burglary." (Internal quotation marks omitted.)).

State *v.* Ashby

this state's plain meaning rule, as embodied in General Statutes § 1-2z, and various cannons of statutory construction.

Neither *Allen* nor its progeny, however, supports the defendant's interpretation of this court's reasoning. Indeed, that case was expressly dependent on the victim's sense of terror. Broadening the holding of that case to reach *any* indoor criminal act would not only dispense with that requirement but also with the need for any occupants at all. Although such facts are not always required for the commission of a burglary; compare General Statutes § 53a-102 (a) (occupancy is required for burglary in second degree) with General Statutes § 53a-101 (a) (3) (occupancy is not required for burglary in first degree); or for a finding of an unlawful remaining itself; see footnote 40 of this opinion; the fact that the defendant's presence was "likely to terrorize" the victim in *Allen* was indispensable to our conclusion that any existing license or privilege to remain had been implicitly revoked. (Internal quotation marks omitted.) *State* v. *Allen*, supra, 216 Conn. 384.

This narrower reading of *Allen* is bolstered by the fact that the Appellate Court has consistently restricted its application to cases in which the state has presented evidence that the defendant engaged in conduct likely to terrorize occupants. See, e.g., *State* v. *Marsan*, 192 Conn. App. 49, 53–54, 56–61, 216 A.3d 818 (declining to extend *Allen* to case in which home aide stole from client's unoccupied home), cert. denied, 333 Conn. 939, 218 A.3d 1049 (2019); *State* v. *Bharrat*, 129 Conn. App. 1, 26–27, 20 A.3d 9 (implicit revocation of license or privilege to remain when defendant awoke victim by stabbing him to death with knife), cert. denied, 302 Conn. 905, 23 A.3d 1243 (2011); *State* v. *Morocho*, 93 Conn. App. 205, 219, 888 A.2d 164 ("whatever possible license the defendant thought he had to enter the victim's bedroom . . . that license was withdrawn when

State *v.* Ashby

he refused to identify himself, charged toward the victim, lay on top of her and attempted to kiss and to touch her all over her body''), cert. denied, 277 Conn. 915, 895 A.2d 792 (2006); *State* v. *Brooks*, 88 Conn. App. 204, 208 n.2, 868 A.2d 778 (''[e]ven if the evidence could be construed to show an implicit consent to the defendant's entry into [the] apartment, [a] vicious assault . . . was clearly not within the scope of that consent''), cert. denied, 273 Conn. 933, 873 A.2d 1001 (2005); *State* v. *Gelormino*, 24 Conn. App. 563, 572, 590 A.2d 480 (''even if the evidence could be construed to show the victim's implicit consent to the defendant's entry, the vicious assault perpetrated on the victim was clearly not within the scope of that consent''), cert. denied, 219 Conn. 911, 593 A.2d 136 (1991); see also *State* v. *Stagnitta*, 74 Conn. App. 607, 615, 813 A.2d 1033 (although defendant's status as employee may have provided license or privilege to enter private office while restaurant was closed to public, ''that privilege did not extend to entering the office displaying an eight to ten inch knife and demanding money''), cert. denied, 263 Conn. 902, 819 A.2d 838 (2003). The defendant has not cited, and our research has not discovered, any appellate authority extending the holding of *Allen* beyond this context.

The fact that our legislature has declined to express any disagreement with this line of cases over the course of nearly three decades counsels strongly against overruling *Allen* in favor of a more restrictive statutory interpretation. See, e.g., *Commission on Human Rights & Opportunities* v. *Sullivan*, supra, 285 Conn. 216–17. This is especially true because the legislature has made unrelated amendments to the relevant statutory scheme. See *Stuart* v. *Stuart*, 297 Conn. 26, 47, 996 A.2d 259 (2010) (argument in favor of ''[l]egislative concurrence is particularly strong [when] the legislature makes unrelated amendments in the same statute'' (internal quota-

tion marks omitted)). Specifically, our legislature passed a series of comprehensive amendments to this state's burglary statutes in 2008 that not only retained the phrase "enters or remains unlawfully" in § 53a-101 (a) and the existing statutory definition set forth in § 53a-100 (b), but also added several new instances of that exact same statutory phrase. Public Acts, Spec. Sess., January, 2008, No. 08-1, §§ 1, 2 and 4. We may presume that the legislature was aware of *Allen* and its progeny when doing so. See, e.g., *R.C. Equity Group, LLC* v. *Zoning Commission*, 285 Conn. 240, 257 n.20, 939 A.2d 1122 (2008).

The defendant's various arguments do not warrant the opposite result. The defendant, citing § 1-2z, encourages this court to abandon the existing line of cases and to begin the process of statutory construction anew. We decline to do so. See, e.g., *Kasica* v. *Columbia*, 309 Conn. 85, 93–94 and n.10, 70 A.3d 1 (2013) (in interpreting statutory text, this court is bound by our prior constructions of statute); *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 501, 923 A.2d 657 (2007) (enactment of § 1-2z did not overrule existing case law). Although an argument in favor of overruling established precedent may well be strengthened by tension with a statute's plain meaning, we can discern no such conflict in the present case. When a building is not open to the public, the relevant statutory inquiry turns on whether a defendant was "licensed or privileged" to remain. General Statutes (Rev. to 2001) § 53a-100 (b). The holding of *Allen*, which merely stated the standard for proving the absence of such a license or privilege in a particular factual setting, is facially consistent with that requirement. Finally, the defendant's argument that *Allen* results in statutory surplusage because it dispenses with the element of an unlawful entry or remaining is logically dependent on the premise that *any* indoor criminal conduct necessarily gives rise to an

State *v.* Ashby

implicit revocation. Because, as we previously indicated, the holding in *Allen* extends only to conduct by a defendant that is ''likely to terrorize occupants''; (internal quotation marks omitted) *State* v. *Allen*, supra, 216 Conn. 384; the distinct elements of the crime of burglary remain.

The defendant is correct that intermediate appellate courts in New York have declined to conclude that viop lent conduct gives rise to an implicit revocation of a defendant's license or privilege to remain. See *People* v. *Bowen*, 17 App. Div. 3d 1054, 1055, 794 N.Y.S.2d 203, appeal denied, 5 N.Y.3d 759, 834 N.E.2d 1264, 801 N.Y.S.2d 254 (2005); *People* v. *Konikov*, 160 App. Div. 2d 146, 152–53, 559 N.Y.S.2d 901, appeal denied, 76 N.Y.2d 941, 564 N.E.2d 680, 563 N.Y.S.2d 70 (1990). The conclusion reached in *Allen*, however, is consistent with the law in states other than New York. See *Davis* v. *State*, 737 So. 2d 480, 484 (Ala. 1999) (''[E]vidence of a struggle giving rise to the inference of an unlawful remaining is supplied by [the defendant's] choice to kill by a [less than instantaneous] technique of strangulation and by his use of three nonfatal stab wounds to the victim's lower back. Based on the circumstances suggested by the evidence, the jury reasonably could have found that [the defendant], from the point at which he began committing his criminal acts, 'remain[ed] unlawfully' in [the victim's] home with the intent to commit a crime.''); *Sparre* v. *State*, 164 So. 3d 1183, 1200– 1201 (Fla.) (defendant's invitation to premises was ''effectively rescinded'' when victim began attempting futilely to defend herself from fatal attack), cert. denied, U.S. , 136 S. Ct. 411, 193 L. Ed. 2d 325 (2015); *State* v. *Walker*, 600 N.W.2d 606, 610 (Iowa 1999) (victim's begging and resistance to assault amounted to implicit revocation of defendant's license to remain). Notwithstanding common origins, modern burglary law often differs significantly between jurisdictions. See *Quarles* v. *United States*, U.S. , 139 S. Ct. 1872,

State *v.* Ashby

1879, 204 L. Ed. 2d 200 (2019). Such variations are, without more, generally insufficient to overcome the weighty considerations attendant to stare decisis.[42] See, e.g., *Graham* v. *Commissioner of Transportation*, 330 Conn. 400, 420, 195 A.3d 664 (2018).

In light of the foregoing, we decline the defendant's invitation to overrule *Allen* and its progeny. The defendant advances no argument on appeal that the conduct at issue in the present case was unlikely to terrorize the victim. As a result, the defendant's sufficiency of the evidence claim relating to the crime of burglary in the first degree must fail.

III

Finally, we address the defendant's claim of instructional error because we conclude that the issue of third-party culpability is likely to arise on remand. The defendant contends that a third-party culpability instruction was reasonably supported by the evidence relating to unidentified male DNA discovered on the victim's vaginal swab, her shoulder, and her bedroom doorframe.

_____

[42] The defendant relies on *State* v. *Clark*, 48 Conn. App. 812, 713 A.2d 834, cert. denied, 245 Conn. 921, 717 A.2d 238 (1998), as an example of the absurd results that would occur in the absence of a bright-line rule requiring surreptitious conduct. In that case, the victim was sexually assaulted in her own kitchen by an uninvited assailant. Id., 814, 824. The defendant argues that, "[i]f the conduct [at issue in *Clark*] had occurred outdoors, [the defendant in that case] would not have been guilty of the class B felony of burglary, but only of the class D felony of third degree sexual assault. Clearly the legislature did not intend for there to be such a disparity in the sentence a person could receive simply because the crime was committed indoors as opposed to outdoors."

It is, however, well established that such intrusions into the home cause a unique form of injury that has traditionally been punished as a separate and distinct offense under the law of this state. See, e.g., *State* v. *Little*, 194 Conn. 665, 675–76, 485 A.2d 913 (1984). In the absence of constitutional infirmity, concerns regarding the penalty affixed by statute to the crime of burglary are appropriately addressed to the legislature. See, e.g., *Washington* v. *Commissioner of Correction*, 287 Conn. 792, 828, 950 A.2d 1220 (2008) (acknowledging "the legislature's authority to define crimes and [set] appropriate penalties").

State *v.* Ashby

In response, the state argues that this evidence was insufficient to support such an instruction.[43] Specifically, the state argues that this evidence establishes only that "the victim may have socialized, done drugs, and had sex with various men in the days preceding her death" and, therefore, fails to establish a direct connection "between any particular third party and the crimes against the victim . . . ."

The following additional facts and procedural history are relevant to our discussion of this claim. Carll Ladd, the supervisor of the DNA section of the state forensic laboratory, testified at trial that a particular test had indicated that both the defendant and a second, unidentified male were contributors to DNA on the victim's vaginal swab.[44] Ladd also testified that the defendant was excluded as a contributor to certain unidentified male DNA in saliva discovered on the victim's shoulder.[45] Finally, Ladd testified that the defendant also was excluded as a contributor to certain unidentified male DNA discovered at the location of a transfer bloodstain

---

[43] We note that the state also contends that any error in this regard was harmless and that the parties disagree on the burden of proof attendant to such an analysis. See *State* v. *Arroyo*, 284 Conn. 597, 614, 935 A.2d 975 (2007) (declining to consider whether constitutional or nonconstitutional standard of harmless error review applies to improper omission of third-party culpability instruction). Because we address this claim as an issue likely to arise on remand, we need not address questions of harmless error in the present appeal.

[44] Although testimony offered at trial indicated that the victim had unprotected vaginal intercourse with a particular man the night before her death, no evidence was introduced to demonstrate that that man was the source of the unknown male DNA on victim's vaginal swab.

[45] Ladd indicated that this saliva came from a different source than other male DNA found on a condom from the victim's bedroom. In light of certain posttrial evidence linking the condom to another man; see footnote 44 of this opinion; it is reasonable to deduce that neither that man nor the defendant was the source of the male DNA discovered on the victim's shoulder. We note that, although both the state and the defendant make the same inference in briefing various issues in the present appeal, this information was not available to the trial court when it instructed the jury.

State *v.* Ashby

on the victim's bedroom doorframe.[46] Ladd testified that he did not know precisely when any of this male DNA was deposited.

The defendant's revised request to charge included the following proposed instruction regarding evidence of third-party involvement: "You are hereby instructed that a defendant may offer proof [that] indicates that a third party, and not the defendant, committed some of the acts for which the defendant is on trial. The defendant must, however, show some evidence which, if believed, tends to directly connect a third party to said acts. The primary object of the third-party suspect testimony is not to prove the guilt of the third party but to raise a reasonable doubt about the guilt of the defendant. In the present case, you have heard evidence concerning the presence of the DNA of a person or persons other than [the defendant] and [the victim] at the scene of the crime. If that evidence leaves you with a reasonable doubt as to [the defendant's] guilt, you must find him not guilty."[47]

The state objected to this proposed instruction at a charging conference held on June 12, 2007. In response, defense counsel asserted that such an instruction was warranted by "the forensics" proffered at trial, citing *State* v. *Cerreta*, 260 Conn. 251, 260–62, 796 A.2d 1176 (2002). After hearing arguments, the trial court concluded that the defendant had failed to establish entitlement to a third-party culpability instruction.

"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to

---

[46] With respect to this sample, Ladd testified that the victim was a major contributor and that the unidentified male was a minor contributor.

[47] We note that the current revision of the model criminal jury instructions contains similar language. See Connecticut Criminal Jury Instructions 2.6-10, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited August 5, 2020).

State *v.* Ashby

supporting the . . . proposed charge. . . . A request
to charge [that] is relevant to the issues of [a] case and
[that] is an accurate statement of the law must be given.
. . . If, however, the evidence would not reasonably
support a finding of the particular issue, the trial court
has a duty not to submit it to the jury. . . . Thus, a
trial court should instruct the jury in accordance with
a party's request to charge [only] if the proposed instruc-
tions are reasonably supported by the evidence.'' (Inter-
nal quotation marks omitted.) *State* v. *Schovanec*, 326
Conn. 310, 318–19, 163 A.3d 581 (2017). This court has
previously stated that ''the very standards governing
the admissibility of [third-party] culpability evidence
also should serve as the standards governing a trial
court's decision of whether to submit a requested [third-
party] culpability charge to the jury.'' *State* v. *Arroyo*,
284 Conn. 597, 608–609, 935 A.2d 975 (2007).

We note that, although *Arroyo* did not expressly state
a particular standard of review for claims of instruc-
tional error related to third-party culpability, this court
has previously reviewed such claims under an abuse
of discretion standard. See *State* v. *Schovanec*, supra,
326 Conn. 320–23; *State* v. *Jackson*, 304 Conn. 383, 424,
40 A.3d 290 (2012); see also *State* v. *James*, 141 Conn.
App. 124, 137, 60 A.3d 1011, cert. denied, 308 Conn. 932,
64 A.3d 331 (2013); cf. *State* v. *Ceballos*, 266 Conn. 364,
422, 832 A.2d 14 (2003) (''[w]e review a trial court's
refusal to give a child credibility instruction for abuse
of discretion because that instruction is not for the state-
ment of any rule of law but for a cautionary comment
upon the evidence'' (internal quotation marks omit-
ted)); *State* v. *Hines*, 243 Conn. 796, 816, 709 A.2d 522
(1998) (''[t]he decision whether to give an instruction
on flight, as well as the content of such an instruction,
if given, should be left to the sound discretion of the
trial court'').

The admissibility of third-party culpability evidence
is generally ''governed by the rules relating to relevancy.

State *v.* Ashby

. . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . [E]vidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that [raises] only a bare suspicion that a third party, rather than the defendant, committed the charged offense [is not] relevant to the jury's determination.'' (Internal quotation marks omitted.) *State* v. *Schovanec*, supra, 326 Conn. 319; see also *State* v. *Baltas*, 311 Conn. 786, 810, 91 A.3d 384 (2014) (''in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated [that] [s]uch evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of [third-party] culpability'' (internal quotation marks omitted)).

''[I]n some cases, the location of [physical] evidence at a particular crime scene will give rise to a reasonable inference that the evidence was left at the scene by a perpetrator of the crime, such as when the relationship between the evidence and crime scene is close and direct . . . .'' (Citation omitted.) *State* v. *West*, 274 Conn. 605, 626–27, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005). This nexus, however, necessarily attenuates with distance. See id., 627 (concluding that evidence discovered ''at the periphery of the crime scene'' lacked probative value). A comparison of our decisions in *Cerreta* and *West* is illustrative of this principle.

In *State* v. *Cerreta*, supra, 260 Conn. 253, this court considered a claim that third-party culpability evidence was improperly excluded in violation of the defendant's

right to present a defense under the sixth and fourteenth
amendments to the United States constitution. The vic-
tim in that case, a seventy-four year old woman, died
from asphyxia after being bound with a sock in her
mouth. Id., 254. The defendant, who had been charged
with murder, sought to introduce forensic evidence con-
nected to the crime scene. Id., 253. Specifically, the
defendant submitted evidence indicating that hairs
found on both the victim's body and the ligatures used
to bind her had not come from him. Id., 257–59. The
defendant also sought to introduce evidence that finger-
prints from a third party had been discovered on various
personal effects strewn about the victim's body. Id., 254,
259. The trial court excluded these pieces of forensic
evidence on relevancy grounds. Id., 259. On appeal, the
defendant claimed that the proffered evidence should
have been admitted because it "was relevant to the
question of whether someone [else had] committed the
crime . . . charged." Id. The state responded by
arguing, among other things, that the forensic evidence
stopped short of "conclusively exonerating the defen-
dant"; id., 260; and was irrelevant "because it was
impossible to determine exactly when the hair and fin-
gerprints were left where the police discovered them."
Id., 263.

This court agreed with the defendant, concluding that
it could "discern no reasonable basis for concluding
that the exculpatory evidence the defendant sought to
introduce was irrelevant." Id., 262. Specifically, we held
that "[e]vidence that a third party's hair and fingerprints
were found at the crime scene [raised] more than a
bare suspicion that someone other than the defendant
may have committed the crime. Rather, the excluded
evidence established a direct connection between the
unidentified source of hair and fingerprints and the
scene of the murder. Such evidence meets the threshold
requirement that it directly connect a third party to the

State *v.* Ashby

crime.''[48] Id., 263. We then rejected the state's arguments
to the contrary: ''The hair and fingerprints were recov-
ered not from the periphery of the crime scene but from
the victim's body, the ligatures used to bind her hands
and feet, and the personal effects on and around her
body. This evidence was central to the only contested
issue at trial: the identity of the perpetrator. Although
it may be the case that this evidence would not have
exonerated the defendant unequivocally, such is not
the standard for relevance. All that must be shown is
that the evidence tends to support the conclusion for
which it is offered, even if it does so only to a slight
degree.'' Id.

By contrast, in *State* v. *West*, supra, 274 Conn. 610,
this court concluded that the trial court did not abuse
its discretion by excluding certain forensic evidence
recovered from a crime scene. The defendant in that
case, who was charged with murder, sought to intro-
duce evidence eliminating her as the source of unidenti-
fied latent prints discovered in the victim's home on a
second floor bathroom door and on the doorjamb of a
first floor bedroom. Id., 609, 623. The defendant claimed
''that the unidentified . . . [prints were] relevant, and
therefore admissible, because that evidence established
that a person or persons other than the defendant were
present in those areas of [the] home where the intruder
had gone after entering . . . namely, the second floor

---

[48] In reaching this conclusion, this court noted: ''The restrictions placed
on [third-party] culpability evidence are concerned primarily with reliability
and, in essence, seek to ensure that a defendant does not introduce tenuous
evidence of [third-party] culpability in an attempt to divert from himself the
evidence of guilt. . . . Those same concerns do not exist . . . where the
evidence the defendant [seeks] to introduce [is] reliable, physical evidence
that had undergone the rigors of forensic analysis.'' (Citations omitted.)
*State* v. *Cerreta*, supra, 260 Conn. 262, citing *State* v. *Hernandez*, 224 Conn.
196, 202, 618 A.2d 494 (1992) (evidence of threat by third party), and *State*
v. *Echols*, 203 Conn. 385, 392–94, 524 A.2d 1143 (1987) (evidence that third-
party lookalike committed similar crime in same vicinity).

State *v.* Ashby

and the first floor master bedroom.'' Id., 626. We rejected that argument, concluding that the prints could have been ''made weeks, months or even years before'' the crimes at issue. Id. We noted that, although the location of such evidence can ''give rise to a reasonable inference that the evidence was left at the scene by a perpetrator . . . when the relationship between the evidence and crime scene is close and direct,'' the prints at issue in that case ''were located at the periphery of the crime scene, where . . . they may have been left by any number of invitees . . . .'' Id., 626–27. We remarked that, ''[b]ecause the nexus between the prints and the crime scene [was] so attenuated, and because there [were] so many likely explanations for the prints aside from the mere possibility that they were left by an unidentified perpetrator, the evidence of the prints [was] lacking in probative value.''[49] Id., 627. Accordingly, this court concluded that the trial court did not abuse its discretion by excluding the unidentified prints that the defendant had sought to admit. Id.

The evidence forming the basis of the defendant's request for a third-party culpability instruction in the present case was, of course, admitted into evidence and placed before the jury.[50] The trial court's initial decision to admit that evidence does not, however, necessarily compel the issuance of a third-party culpability

[49] This evidence stood in contrast to an unidentified print lifted from a gasoline filled soda bottle that had been used in the commission of the underlying crime that, we noted, had been properly admitted during the course of the underlying trial. *State* v. *West*, supra, 274 Conn. 616, 627 n.29.

[50] We note that the trial court ''is in the best position to view the evidence in the context of the entire case and has wide discretion in making its evidentiary rulings.'' *State* v. *Schovanec*, supra, 326 Conn. 320; see also *State* v. *Walsh*, 67 Conn. App. 776, 790, 789 A.2d 1031, cert. denied, 260 Conn. 906, 795 A.2d 546 (2002). Like the decision of whether to give a third-party culpability instruction, a trial court's decision as to the admissibility of ''[third-party] inculpatory evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done.'' (Internal quotation marks omitted.) *State* v. *West*, supra, 274 Conn. 626.

State *v.* Ashby

instruction as a matter of law.[51] "Whether a defendant
has sufficiently established a direct connection between
a third party and the crime with which the defendant
has been charged is necessarily a fact intensive inquiry."
*State* v. *Baltas*, supra, 311 Conn. 811. A trial court must
make that decision on the basis of the totality of the
evidence actually admitted at trial. See *State* v. *Mar-
shall*, 114 Conn. App. 178, 187, 969 A.2d 202 (noting
fluid nature of trials), cert. denied, 292 Conn. 911, 973
A.2d 661 (2009).

In order to determine whether the evidence actually
admitted during the course of the defendant's trial would
have supported a third-party culpability instruction, we
look to the context surrounding it and the guiding prin-
ciples set forth in *Cerreta* and *West*. See *State* v. *Arroyo*,
supra, 284 Conn. 608–609. It cannot be said that two of
the DNA samples found on the victim's body—namely,
the samples from her vaginal swab and from the saliva
on her shoulder—were recovered from the periphery
of the crime scene. Like the hair in *Cerreta*, that evi-
dence was recovered directly from the victim's body.
It is important to note that *context*, and not proxim-
ity alone, is necessary to establish a direct connection
between forensic evidence and a third party to the crime.
In the present case, for example, Ladd gave a "general
estimate" that the unidentified male DNA found on the
victim's vaginal swab could have lasted for up to three
days. Given this longer time frame, the unidentified
male DNA on the victim's vaginal swab, in and of itself,
would have been insufficient to require a third-party

_____

[51] For example, a trial court that exercises its discretion to admit forensic
evidence demonstrating the presence of a third party at a crime scene
nonetheless may act within its discretion by declining to give a third-party
culpability instruction in the event the evidence actually admitted at trial
falls short of proving a direct connection. Put differently, the fact that the
trial court's predicate evidentiary rulings may have benefited the defendant
does not compel the conclusion that its ultimate decision to withhold an
instruction was error. Cf. *State* v. *Schovanec*, supra, 326 Conn. 316–17, 323.

culpability instruction as a matter of law. The male DNA on the victim's shoulder, however, would have existed for a more limited duration and was not otherwise explained by the record. Finally, the unidentified male DNA on the doorframe of the victim's bedroom was recovered from a location that was, undisputedly, covered in the victim's blood during the commission of the crimes charged. That fact readily distinguishes it from the prints on the doorjamb in *West*.

The state argues that the evidence of the unidentified male DNA discovered at the crime scene was wholly irrelevant because "there was no evidence as to when any of that DNA had been deposited or to whom it belonged." The fact that both the source of the DNA and the exact time that it was deposited remained unknown does not, however, require a conclusion that the evidence was irrelevant. Indeed, this court readily concluded that the evidence at issue in *Cerreta* was admissible, notwithstanding the absence of proof regarding those same facts. See *State* v. *Cerreta*, supra, 260 Conn. 263 ("The state took the position . . . that the excluded evidence was unreliable, and therefore irrelevant, because it was impossible to determine exactly when the hair and fingerprints were left where the police discovered them. We find no merit in this argument.").

Viewing all of the evidence contained in the record in the light most favorable to supporting the proposed charge; see, e.g., *State* v. *Schovanec*, supra, 326 Conn. 318; we conclude that the defendant satisfied the threshold requirement of establishing a direct connection between at least some of the unidentified male DNA discovered in the victim's apartment and the various crimes alleged. Because the DNA on the victim's shoulder and the bedroom doorframe would have reasonably supported an instruction on third-party culpability, we

State *v.* Ashby

conclude that the trial court abused its discretion by declining to provide such an instruction to the jury.[52]

The judgment is reversed and the case is remanded for a new trial.

In this opinion PALMER, McDONALD, D'AURIA, KAHN and ECKER, Js., concurred.

MULLINS, J., concurring in part and dissenting in part. I respectfully disagree with part I of the majority opinion[1] because, in my view, there is ample support in the record for the trial court's factual finding that Kenneth Pladsen, Jr., was not acting as an agent of the state when he elicited certain incriminating statements from the defendant, Lazale Ashby. Accordingly, I would conclude that the trial court correctly denied the defendant's motion to suppress those statements because the state did not obtain them in violation of the defendant's sixth amendment right to counsel under *Massiah* v. *United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). I would therefore affirm the defendant's convictions stemming from the December 1, 2002 murder of the victim.[2]

[52] We emphasize that the question of whether the evidence actually admitted in any new trial will reasonably support a third-party culpability instruction must be vested, in the first instance, to the sound discretion of the trial court. See, e.g., *State* v. *Jackson*, supra, 304 Conn. 424.

[1] I agree with and join parts II and III of the majority opinion.

[2] I have reviewed the numerous other claims of error that the defendant has raised in the present case; see footnote 2 of the majority opinion; and conclude that none of them warrants a reversal of any of his convictions, either because they lack merit, or because they constitute harmless error. With respect to the trial court's improper failure to instruct the jury on third-party culpability; see part III of the majority opinion; I would conclude that, assuming without deciding that such errors are subject to the constitutional harmless error standard; see *State* v. *Arroyo*, 284 Conn. 597, 614, 935 A.2d 975 (2007); the error was harmless beyond a reasonable doubt. The absence of the instruction did not preclude the defendant from advancing his third-party culpability defense, as evidence of third-party culpability— DNA from unknown individuals found on the victim and around her apartment—was admitted into evidence at trial, and defense counsel argued during closing argument that one of these unknown individuals could have

State *v.* Ashby

Consistent with the majority of jurisdictions across the country, this court has recognized that an informant who obtains incriminating information from a defendant is not an agent of the state for purposes of *Massiah* unless the state had expressly or implicitly directed the informant to obtain information, or offered the informant some type of benefit in exchange for information. See, e.g., *State* v. *Swinton*, 268 Conn. 781, 858, 847 A.2d 921 (2004) (jailhouse informant was not state agent when he obtained information without having been directed to do so or offered reward). Pladsen's testimony at the suppression hearing, which this court is bound to accept on appeal because the trial court explicitly credited it, establishes that these requirements are not present in this case.

Pladsen testified that, during his single meeting with Detective Andrew Weaver of the Hartford Police Department on January 5, 2007, (1) Weaver never instructed him to obtain information from or do "anything relative to" the defendant, (2) he and Weaver made no "agreement of any sort," (3) it was not "implied" to him that he should obtain information, and (4) Weaver made "very clear" he was not offering any benefits or deals and, in fact, lacked the authority to do so. Pladsen further testified that his subsequent decision, made several months later, to obtain the incriminating statements from the defendant was one that he made "on [his] own," rather than in response to any directive from Weaver, and that he did so on the "spur of the moment" when "the opportunity presented itself . . . ." This testimony provides ample—if not overwhelming—support for the trial court's finding that Pladsen was not a state agent.

killed the victim. Further, the state's case against the defendant was strong. Among other things, the defendant's DNA was found on the vaginal swab taken from the victim and he provided a written, sworn statement to the police in which he confessed in detail to having stabbed and strangled the victim. See footnote 5 of the majority opinion and accompanying text.

State *v.* Ashby

This case also lacks any of the other circumstances typically characteristic of an agency relationship. The state had no preexisting arrangement with Pladsen or any plan to use his services. Pladsen had no history of serving as an informant; indeed, Weaver was completely unaware of Pladsen until he reached out to Weaver and requested a meeting. Nor did the police have any involvement in or control over Pladsen's activities. They were uninvolved in the placement of Pladsen in the cell next to the defendant, and Weaver's single meeting with Pladsen occurred several months before Pladsen obtained the incriminating information from the defendant. During the intervening months, Weaver never communicated directly with Pladsen and did not direct or control his interactions with the defendant. Most important, no state official ever asked, directed or suggested that Pladsen obtain any information from the defendant. In light of this evidence, I simply do not see how the trial court's finding that Pladsen was acting on his own initiative, rather than as an agent of the state, is not supported by substantial evidence.

The majority does not dispute most of these points. Instead, it approaches the agency question from an entirely different road—one that, in my view, cannot be reconciled with this court's prior cases. In so doing, the majority implicitly overrules or abrogates numerous of this court's prior decisions addressing agency questions in the context of sixth amendment and other constitutional claims. For instance, this court has long recognized that a trial court's agency determination is a factual question that must be upheld on appeal as long as it is supported by substantial evidence. Today, however, the majority reverses that line of cases and concludes that it is a mixed question of law of fact subject to plenary review.

Furthermore, and far more significant, the majority abandons this court's long settled test for determining

State *v.* Ashby

whether an informant acted as a state agent—a test requiring some showing that the police had expressly or impliedly asked for information or offered an inducement for obtaining it—in favor of a new standard under which the dispositive question is whether the police "knew or should have known" that the conversation with the informant "was likely to end in further deliberate elicitation." I respectfully disagree with this new standard. In my view, it is based on a misreading of the United States Supreme Court's decision in *United States* v. *Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), a case widely regarded as largely irrelevant to the agency prong of *Massiah*, and is at odds with precedent from this court and other jurisdictions.

Finally, even accepting the majority's framing of the correct standard, I disagree that Weaver "knew or should have known" that his meeting with Pladsen, as opposed to Pladsen's own preexisting desire to curry favor with the police, would have prompted Pladsen to attempt to elicit additional incriminating information from the defendant. In my view, the majority's analysis reads more into the testimony at the suppression hearing than is appropriate, relies on factors that have limited or no relevance to agency, and is based primarily on the majority's own assumptions about what motivated Pladsen and how he interpreted his meeting with Weaver, some of which are undermined by Pladsen's own testimony.

To be sure, the majority raises some legitimate concerns about the way in which Weaver handled his interactions with Pladsen. In particular, Weaver asked Pladsen if he would be willing to wear a wire sometime in the future in order to record his conversations with the defendant. Although Weaver never pursued the wire and made clear to Pladsen that he was not authorizing such a tactic and, in fact, lacked authority to proceed any further, such a statement, when considered in isola-

State *v.* Ashby

tion, could arguably have suggested to Pladsen that additional incriminating information was desired. Ultimately, however, the significance the majority accords this statement is directly contradicted by Pladsen's own testimony—which was credited by the trial court—that he had not been offered anything or directed to do anything, and that he obtained the information from the defendant, not as a result of anything Weaver had said to him, but on his own initiative.

I

APPLICABLE LEGAL PRINCIPLES

I begin with the general principles governing the defendant's claim. Under *Massiah* v. *United States*, supra, 377 U.S. 201, a defendant's sixth amendment right to counsel is violated if a state agent deliberately elicits incriminating information from the defendant after formal charges have been brought and outside the presence of the defendant's counsel. Id., 205–206. "[T]he prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine* v. *Moulton*, 474 U.S. 159, 171, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985).

To prevail on a *Massiah* claim, the defendant must demonstrate that the informant both (1) was acting as an agent of the state, and (2) "deliberately elicited" the incriminating statements from him. (Internal quotation marks omitted.) *State* v. *Swinton*, supra, 268 Conn. 855–56. Under this dual pronged analysis, "the agency inquiry *is precedent to and distinct from* determining whether [the] agent 'deliberately elicits' information." (Emphasis added.) *Creel* v. *Johnson*, 162 F.3d 385, 393 (5th Cir. 1998), cert. denied, 526 U.S. 1148, 119 S. Ct. 2027, 143 L. Ed. 2d 1038 (1999); see, e.g., *State* v. *Swinton*, supra, 855–56 (analyzing separately questions of agency and deliberate elicitation).

State *v.* Ashby

In the present case, the state does not contest that Pladsen deliberately elicited information from the defendant. The sole issue is whether Pladsen was acting as an agent of the state when he did so. As I will explain; see part II of this opinion; there is ample support in the record for the trial court's finding that he was not.

A

Standard of Review

Before addressing the substantive agency question, however, I must note my disagreement with the majority's treatment of the trial court's finding that Pladsen was not acting as an agent of the state as a question of law that is subject to plenary review. I would adhere to this court's long line of decisions, all of which recognize that such determinations are factual findings that are entitled to deference on appeal.

It is well settled in Connecticut that "[t]he issue of agency, even in a constitutional context, is primarily a question of fact . . . ." (Citations omitted.) *State* v. *Alexander*, 197 Conn. 180, 185, 496 A.2d 486 (1985); see also *State* v. *Swinton*, supra, 268 Conn. 855 (agency is "issue of fact"). Ordinarily, this court cannot overturn factual findings unless they are clearly erroneous. "When, however, [a question of fact is essential to the resolution of a constitutional claim and] the credibility of the witnesses is not the primary issue, our customary deference to the trial court is tempered by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Alexander*, supra, 185.

This "substantial evidence" standard of review, however, although less deferential than the clearly erroneous standard, does not amount to plenary review. See *State* v. *Pinder*, 250 Conn. 385, 421, 736 A.2d 857 (1999)

State *v.* Ashby

("the 'substantial evidence' language" is "inconsistent with the plenary review that we in fact conduct" when reviewing legal question of whether confession is voluntary); see also *State* v. *Johnson*, 253 Conn. 1, 124–26, 751 A.2d 298 (2000) (*Schaller, J.*, dissenting) (scrupulously reviewing record for substantial evidence is more deferential than plenary review). In other words, we cannot disregard the trial court's finding and make our own independent determination as to whether Pladsen was an agent of the state. Rather, the trial court's conclusion is "entitled to deference so long as [it is] supported by substantial evidence . . . ." *State* v. *Whitaker*, 215 Conn. 739, 754, 578 A.2d 1031 (1990). That is why this court has upheld findings that no agency relationship existed on appeal, even when the record revealed some evidence tending to show such a relationship. See *State* v. *Alexander*, supra, 197 Conn. 187 (trial court's finding that private citizen was not state agent was supported by substantial evidence despite extensive police involvement and encouragement because "[b]alanced against these factors" was evidence that "support[ed] the trial court's conclusion"); see also *State* v. *Lasaga*, 269 Conn. 454, 466–67, 848 A.2d 1149 (2004) (upholding finding of no agency relationship despite "conflicting testimony regarding whether the police had asked [the private citizen] to continue to provide them with more information").

The majority acknowledges this "substantial evidence" limitation on our scope of review in passing but then proceeds to treat agency as a mixed question of law and fact, deferring only to the trial court's subsidiary factual findings, while reviewing de novo the court's ultimate determination of whether those facts created an agency relationship.[3]

---

[3] After referencing the substantial evidence test, the majority observes in the very next sentence that, "to the extent that the resolution of [the agency] question calls for application of the controlling legal standard to the historical facts, it presents a . . . question of law . . . which [this court reviews] de novo." (Internal quotation marks omitted.) As support for this proposition,

State *v.* Ashby

This court, however, has uniformly recognized that the ultimate determination of agency is *itself* a factual finding; see *State* v. *Swinton*, supra, 268 Conn. 855; *State* v. *Alexander*, supra, 197 Conn. 185; that must be upheld on appeal as long as there is substantial evidence to support it. See *State* v. *Betts*, 286 Conn. 88, 101, 942 A.2d 364 (2008) ("there was substantial evidence to support the trial court's conclusion that [the private actor] was not an agent of the police"); *State* v. *Lasaga*, supra, 269 Conn. 466 ("our examination of the record reveals that there was substantial evidence for the trial court's conclusion" that private actor was not state agent); *State* v. *Alexander*, supra, 185 ("there was substantial evidence for the trial court's conclusion that [the private actor] was not acting as an agent of the state"); see also *State* v. *Betts*, supra, 95 n.14 (emphasizing that agency issues are correctly reviewed under substantial evidence rather than plenary standard).

In footnote 19 of its opinion, the majority expressly disavows the substantial evidence method of review applied in these prior decisions—thereby rendering the conclusions reached in those decisions of virtually no precedential value—in favor of the de novo standard employed by many of the federal courts of appeals.[4]

the majority quotes *State* v. *Castillo*, 329 Conn. 311, 322–23, 186 A.3d 672 (2018), a decision addressing whether the defendant was in custody for purposes of a fifth amendment claim, which is an issue that, unlike the issue of agency, has long been recognized as a mixed question of law and fact subject to de novo review.

[4] As a justification for its departure from this court's prior cases, the majority notes that "questions of law abound in [the] context" of an agency analysis. See footnote 19 of the majority opinion. But *Alexander* and its progeny were not incorrect in applying substantial evidence review merely because the question of agency involves the application of a legal standard. Many disputed issues require a legal standard to be applied to underlying facts, yet are not treated as questions of law subject to de novo review. See, e.g., *Ferndale Dairy, Inc.* v. *Geiger*, 167 Conn. 533, 537–38, 356 A.2d 91 (1975) ("it [was] a question of fact to be determined by the jury in applying established legal principles whether the manner in which the [defendant's] car was operated and brought to a stop was the proximate cause of the accident").

State *v.* Ashby

Although I welcome any tacit concession from the majority that the trial court's determination that Pladsen was not a state agent is supported by substantial evidence and would have to be upheld under that standard, I see no compelling reason to take the drastic step of overturning this body of case law, particularly when neither party in the present case has explicitly asked us to do so, and when federal courts of appeals are split on the issue.[5] See *State* v. *McCleese*, 333 Conn. 378, 412–13, 215 A.3d 1154 (2019) ("when no party has asked us to overrule precedent, we are particularly reluctant to address . . . much less disturb" such precedent).

The majority's use of a plenary standard of review colors its analysis in substantive ways. Rather than limit itself to the question of whether there is adequate support in the record for the trial court's finding, the majority bases its analysis largely on its own assumptions about Pladsen's subjective motivations and how he likely interpreted his conversation with Weaver. For instance, the majority posits that Weaver's meeting with Pladsen must have "indicate[d]" to Pladsen that the state wanted incriminating information about the defendant; that Pladsen must have "readily infer[red]" that the state only wanted verifiable evidence about this particular case, "such as a recording or writing"; that their conversation suggested to Pladsen that the state would be willing to provide him with a benefit in exchange for information; and that the state's decision not to object to Pladsen's subsequent request for modification of his sentence "provided something objectively valuable [to Pladsen] in exchange for [his] cooperation."

Pladsen, however, who was questioned extensively at the suppression hearing, never testified that he inter-

---

[5] There also are federal courts of appeals that, consistent with Connecticut case law, treat the ultimate finding of agency as a question of fact. See *United States* v. *Li*, 55 F.3d 325, 328 (7th Cir. 1995); *United States* v. *Van Scoy*, 654 F.2d 257, 261 (3d Cir.), cert. denied, 454 U.S. 1126, 102 S. Ct. 977, 71 L. Ed. 2d 114 (1981).

State *v.* Ashby

preted his meeting with Weaver in the manner that the majority suggests. Nor did the trial court make any such factual findings. I, of course, acknowledge that our scrupulous review of the record "must take account of any undisputed evidence that does not support the trial court's ruling . . . but that the trial court did not expressly discredit." *State* v. *Edmonds*, 323 Conn. 34, 39, 145 A.2d 861 (2016); see also *State* v. *DeMarco*, 311 Conn. 510, 520 and n.4, 88 A.3d 491 (2014). This basic proposition does not, however, permit this court to draw its own factual inferences from the evidence and then use those inferred facts as the basis for reversing the trial court's ultimate finding that Pladsen was not a state agent. The limited question before us is whether the trial court's finding is supported by substantial evidence, not whether we, ourselves, would draw a different conclusion on the basis of that evidence.

Indeed, a number of the majority's assumptions about how Pladsen interpreted his meeting with Weaver are directly contradicted by Pladsen's own testimony, which the trial court expressly credited.[6] For instance, contrary to the majority's supposition that the meeting confirmed in Pladsen's mind that the state would treat him favorably in exchange for information about the defendant, Pladsen testified that Weaver made it "very clear" that he could offer no deals or benefits, and flatly denied that he and Weaver had reached any mutual understanding by "implication," that anything had been "implied" to him, or that there was any "meeting of the minds . . . ." Further, any suggestion by the majority that Pladsen's decision to elicit information from the defendant was spurred on by Weaver is hard to square

---

[6] The trial court rejected the defendant's claim that Pladsen's testimony at the suppression hearing should be discounted in light of his extensive criminal history and mental health issues. Instead, the trial court observed that his testimony was "intelligent and responsive . . . ." The trial court then found: "[T]he court had sufficient evidence to assess the credibility of Pladsen's hearing testimony, and the court did credit Pladsen's testimony."

State *v.* Ashby

with Pladsen's testimony that, when he left the meeting, he did not necessarily intend to seek information from the defendant, and that his subsequent decision to do so (made several months later) was one that he made "on [his] own."

Accordingly, I would adhere to this court's prior decisions and review the trial court's determination of agency only for substantial evidence. The majority's resort to plenary review, in addition to its overruling of these prior cases, results in an analysis that is untethered to the trial court's factual findings and is based entirely on its own independent interpretation of the evidence. Such an approach invades the province of the trial court as principal fact finder. See, e.g., *State* v. *Johnson*, supra, 253 Conn. 124 (*Schaller, J.*, dissenting) (application of de novo rather than substantial evidence review to factual determination "invad[es] the province of the jury").

B

Legal Standard for Determining Agency

I also disagree with the legal standard the majority applies for determining whether Pladsen was a state agent. Abandoning the multifactor test recognized in this court's prior agency cases, the majority relies on *United States* v. *Henry*, supra, 447 U.S. 264, to conclude that Pladsen was a state agent because Weaver "knew or should have known" that the conversation with the informant "was likely to end in further deliberate elicitation." I disagree with the majority's adoption of this new standard. As case law from this court and other jurisdictions has recognized, agency depends not on what the officer knew or should have known, but on whether the officer's conduct amounted to an express or implied request for information or offer of a benefit in exchange for information.

State *v.* Ashby

As an initial matter, *Henry* is of limited import in the present case because it was decided in the context of the deliberate elicitation prong of *Massiah*, rather than the agency prong. Indeed, the agency relationship between the inmate and the government was clear and virtually undisputed in *Henry*. The inmate had been serving the government as a paid informant for more than one year pursuant to a contingency fee arrangement under which the government would compensate him only when he provided favorable information.[7] *United States* v. *Henry*, supra, 447 U.S. 270. Government officers directed the inmate to approach the defendant, who was housed in the same jail awaiting trial, and instructed him "not to initiate" any conversations with the defendant but to "be alert to any statements" that the defendant might make about the crimes for which he was charged. Id., 266. Despite these instructions, the inmate engaged the defendant in conversations and extracted incriminating statements from him, which later were admitted against him at trial. Id., 266– 67. The government paid the inmate for this assistance. Id., 266.

The United States Supreme Court framed the issue as being "whether under the facts of this case a [g]overnment agent 'deliberately elicited' incriminating statements from [the defendant] within the meaning of *Massiah*." Id., 270. In answering this question in the affirmative, the court relied on three factors: "First, [the informant] was acting under instructions as a paid informant for the [g]overnment; second, [the informant] was ostensibly no more than a fellow inmate of [the defendant];

---

[7] The majority's characterization of *Henry* as a case in which the informant "previously had been paid for providing information," fails to adequately capture how clear and indisputable the agency relationship was in that case. The informant in *Henry* had not merely been paid for information in the past; he also was subject to a formal, ongoing agreement with government officials under which he would be compensated if, and only if, he provided information that proved to be favorable. See *United States* v. *Henry*, supra, 270.

State *v.* Ashby

and third, [the defendant] was in custody and under indictment at the time he was engaged in conversation by [the informant].'' Id. In response to the government's argument that the informant had been specifically instructed not to affirmatively seek information, the court made the following observation, which the majority seizes on in the present case: ''Even if the [officer's] statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, *he must have known* that such propinquity likely would lead to that result.'' (Emphasis added.) Id., 271.

I do not believe that *Henry* stands for the proposition that agency depends on whether the officer who meets with the informant ''must have known'' that their conversation would cause the informant to later attempt to seek additional information from the defendant. See *State* v. *Willis*, 496 S.W.3d 653, 709 (Tenn. 2016) (Rejecting argument that ''the defendant may establish that an informant was a government agent by a mere showing that the [s]tate 'must have known that its agent was likely to obtain incriminating statements' from the defendant without counsel present . . . . We must reject any test that would deem an informant to be a government agent simply because the government was aware or 'must have known' that the informant would likely receive incriminating statements from the defendant.''), cert. denied,    U.S.    , 137 S. Ct. 1224, 197 L. Ed. 2d 466 (2017).

Indeed, as courts have consistently recognized, *Henry* says little about agency at all. The United States Supreme Court ''essentially assumed the existence of agency'' in *Henry* because the informant's contingency fee arrangement with the government made agency a nonissue. *Thomas* v. *Cox*, 708 F.2d 132, 135 n.2 (4th Cir.), cert. denied, 464 U.S. 918, 104 S. Ct. 284, 78 L. Ed. 2d 262 (1983). Instead, the focus in *Henry* was on

State *v.* Ashby

the distinct question of whether the statements were
"deliberately elicited . . . ." *United States* v. *Henry*,
supra, 447 U.S. 277 (Powell, J., concurring) ("I under-
stand that the decision today rests on a conclusion that
this informant deliberately elicited incriminating infor-
mation"); see also *Creel* v. *Johnson*, supra, 162 F.3d 393
(declining to adopt principle from *Henry* as standard
for determining agency because *Henry* concerned only
deliberate elicitation prong); *United States* v. *York*, 933
F.2d 1343, 1356 (7th Cir.) ("*Henry* . . . focused more
directly on whether the challenged statements had been
deliberately elicited rather than the question of whether
the informants were acting as government agents")
(overruled in part on other grounds by *Wilson* v. *Wil-
liams*, 182 F.3d 562, 565 (7th Cir. 1999)), cert. denied,
502 U.S. 916, 112 S. Ct. 321, 116 L. Ed. 2d 262 (1991);
*United States* v. *Watson*, 894 F.2d 1345, 1347–48 (D.C.
Cir. 1990) (fact that informant was in custody, which
was relied on as relevant factor in *Henry*, is irrelevant
to agency); *State* v. *Swinton*, supra, 268 Conn. 858 (not-
ing that *Henry* did not discuss agency); *State* v. *Alexan-
der*, supra, 197 Conn. 184 ("*Henry* did not specifically
address the question of agency"). Thus, the majority's
reliance on *Henry* for the governing standard on agency
questions in misplaced.

Moreover, this court has never interpreted *Henry* as
suggesting that an agency relationship depends on what
the officer who met with the informant knew or should
have known. Instead, this court explained in *Alexander*:
"In *Henry*, the [c]ourt considered it critical that the
informant, previously in the government's paid employ
in similar missions, was specifically contacted by the
government and given his charge respecting the pro-
curement of possibly incriminating information from
[the defendant]. Also important to the *Henry* [c]ourt
was the fact that the informant's mission was on a
[contingent fee] basis . . . thereby demonstrating a
formal prearrangement . . . between [the] state and

State *v.* Ashby

[the] informant . . . . From these circumstances the
[c]ourt in *Henry* was able to characterize the informant
as a [g]overnment agent expressly commissioned to
secure evidence . . . from the accused.'' (Citations
omitted; internal quotation marks omitted.) *State* v.
*Alexander*, supra, 197 Conn. 184, quoting *Thomas* v.
*Cox*, supra, 708 F.2d 135; see also *State* v. *Swinton*,
supra, 268 Conn. 858 (characterizing *Henry* as case in
which "government officials . . . identified [a] speci-
fic [prisoner] from whom they wanted information and
found [an informant] to retrieve that information").[8]
Thus, it was the officers' specific instructions to the
informant and their preexisting fee arrangement with
him—and not the officers' constructive knowledge—
that drove the United States Supreme Court's agency
analysis in *Henry*.

Consistent with this interpretation of *Henry*, this
court, in *Alexander*, established the following standard
for addressing agency questions: "The existence of an
agency relationship . . . turns [on] a number of factual
inquiries into the extent of police involvement with
the informant. Those inquiries include the following:
whether the police have promised the informant a
reward for his cooperation or whether he is self-moti-
vated . . . whether the police have asked the infor-
mant to obtain incriminating evidence and placed him
in a position to receive it . . . and whether the informa-
tion is secured as part of a government initiated, [preex-

---

[8] See also *Matteo* v. *Superintendent, SCI Albion*, 171 F.3d 877, 893 (3d
Cir.) (characterizing *Henry* as concluding that informant was agent "because
he was paid and acting under instructions from the government," and noting
that *Henry* did not "generalize these factors into a rule defining government
agency for future cases" (internal quotation marks omitted)), cert. denied
sub nom. *Matteo* v. *Brennan*, 528 U.S. 824, 120 S. Ct. 73, 145 L. Ed. 2d 62
(1999); *Manns* v. *State*, 122 S.W.3d 171, 179 (Tex. Crim. App. 2003)
("[although] not addressing directly what makes an informant a government
agent, the [c]ourt's [decision in *Henry*] at least indicates that an informant
qualifies if he has a prior arrangement with the government to be paid for
obtaining information and is directed in some manner to obtain information
from the defendant").

State *v.* Ashby

isting plan].'' (Citations omitted.) *State* v. *Alexander*, supra, 197 Conn. 184–85. Since *Alexander*, this court has consistently relied on these factors as ''the primary factors to be considered in determining when an otherwise private citizen has become an agent of the government.'' *State* v. *Gordon*, 197 Conn. 413, 421, 504 A.2d 1020 (1985); see id. (relying on factors in context of sixth amendment right to counsel); see also *State* v. *Betts*, supra, 286 Conn. 89, 96 (fourth amendment search and seizure); *State* v. *Lasaga*, supra, 269 Conn. 463–64 (fourth amendment search and seizure); *State* v. *Swinton*, supra, 268 Conn. 855–59 (sixth amendment right to counsel).

As the *Alexander* factors indicate on their face, an agency analysis turns not on the officer's constructive knowledge about the informant's likely future conduct, but on whether the officer said or did anything that amounted to an express or implied request for information or offer of a reward for information. A review of this court's sixth amendment cases demonstrates that, in the absence of these minimal requirements, there is no agency relationship.

*Alexander*, this court's leading agency decision in the sixth amendment context, is perhaps the most compelling example. In that case, the defendant was incarcerated while awaiting trial on arson charges. *State* v. *Alexander*, supra, 197 Conn. 181, 188. At the time, the victim, who had been implicated as an accomplice in that arson, was missing. Id., 181. James Papagolas, who had befriended both the defendant and the victim, encountered two police officers by chance and informed them that he was planning to visit the defendant in jail. Id., 182, 186. Papagolas ''agreed to contact the police if he heard anything about the victim.'' Id., 186. During a subsequent visit, the defendant admitted to Papagolas that he had killed the victim. Id. Papagolas immediately informed the officers of the defendant's confession. Id.

After learning of the defendant's admission, the officers drove Papagolas to the jail on three subsequent occasions for additional visits with the defendant. Id. Each time, the officers waited for Papagolas outside the jail, and, on the ride home, Papagolas told them what he had learned from the defendant. Id. During the final visit, the defendant told Papagolas where the victim's body was located. Id., 186–87. At his trial for the murder, the defendant moved to suppress the incriminating statements he made to Papagolas on the ground that they were elicited from him without his counsel present, in violation of *Massiah*. Id., 182–83. The trial court found that Papagolas was not acting as a state agent and admitted the statements. Id., 183.

This court affirmed, concluding that there was "substantial evidence" to support the trial court's finding because, "[a]lthough the police may have supported and even encouraged Papagolas' efforts to obtain information from the defendant, their involvement was not so extensive as to create an agency relationship." Id., 185–86. This court acknowledged that "[t]he transportation service provided by the police is the strongest evidence of a possible agency relationship" and that there was evidence that, "by the time of his final visit, Papagolas was motivated, at least in part, by a feeling of responsibility toward the police." Id., 187. "There was also conflicting testimony about whether [the officers] ever asked Papagolas to go to the jail to get information as opposed to simply supporting his own decision to go there." Id. Nonetheless, this court concluded that, "[i]n sum," the record provided adequate support for the trial court's finding because "[b]alanced against these factors, which tend to show police involvement, is the fact that the police neither initiated contact with Papagolas nor directed his activities. Papagolas had no previous affiliation with the police and was neither rewarded

State *v.* Ashby

monetarily nor promised any favors in return for his cooperation.'' Id.

Given the officers' extensive involvement with Papagolas—they drove him to visit the defendant multiple times after learning he had elicited a confession from the defendant—they surely ''knew or should have known'' that their conduct would lead to Papagolas' attempt to elicit additional incriminating statements from the defendant. See *State* v. *Betts*, supra, 286 Conn. 98 (''[*Alexander*] illustrates how extensive police contact with a private citizen may be without creating an agency relationship''). Nonetheless, this court upheld the trial court's finding that Papagolas was not an agent of the state, demonstrating that agency does not depend on what the officers must have known but, rather, on whether they ''directed [the informant's] activities'' or promised something ''in return for [the informant's] cooperation.''[9] *State* v. *Alexander*, supra, 197 Conn. 187.

---

[9] The majority suggests that *Alexander* was overruled by the United States Supreme Court's subsequent decision in *Maine* v. *Moulton*, supra, 474 U.S. 171, which recognized the police's ''affirmative obligation'' not to circumvent defendants' sixth amendment right to counsel. I disagree. As with *Henry*, *Moulton* involved a clear and indisputable case of agency and was decided solely on the basis of the ''deliberate elicitation'' prong of *Massiah*. The informant in *Moulton* had entered into an agreement to assist the police in their investigation in exchange for leniency and, acting under police instruction, secretly recorded a series of conversations between him and his codefendant. Id., 163–64. The sole question in that case was whether the informant had not ''deliberately elicited'' the statements because the codefendant, rather than the informant, had been the one to initiate the conversations. Id., 174–75. Because agency was not at issue, *Moulton* neither overruled nor abrogated this court's discussion of agency principles in *Alexander*. See *Creel* v. *Johnson*, supra, 162 F.3d 393 (defendant's ''reliance on *Moulton* [for applicable agency standard] is misplaced because *Moulton*, which involved a clear case of agency, addressed the different issue of whether the prohibition on using undisclosed agents to 'deliberately elicit' information extended to [when] the accused initiates contact with the agent''); *United States* v. *Li*, supra, 55 F.3d 328 (reference in *Moulton* to government's ''affirmative obligation'' to preserve sixth amendment rights did not affect agency analysis because agency was not at issue); *Commonwealth* v. *Murphy*, 448 Mass. 452, 460, 862 N.E.2d 30 (2007) (''[a]gency was not a contested issue in . . . *Moulton*'' (citation omitted)); *State* v. *Willis*, supra, 496 S.W.3d 709 and n.19 (*Moulton* addressed only deliberate elicitation and was irrelevant to agency); *Manns* v. *State*, 122 S.W.3d 171, 179 (Tex.

State *v.* Ashby

Indeed, as I will explain; see part II of this opinion; *Alexander* cannot be reconciled with the majority's conclusion in the present case.[10]

This court also emphasized these baseline agency requirements in the jailhouse informant context in *State* v. *Swinton*, supra, 268 Conn. 781. In *Swinton*, an inmate assisted the police in multiple cases unrelated to the defendant. Id., 852–53. While still serving as an infor-

Crim. App. 2003) (‘‘*Moulton* . . . adds little to the present discussion [regarding agency]’’).

[10] In addition to concluding that *Alexander* was overruled by *Moulton*; see footnote 9 of this opinion; the majority writes *Alexander* off as being of ‘‘limited utility’’ in the present case because the informant in *Alexander* (1) had not been offered anything in exchange for his cooperation, and (2) was not an inmate. Neither of these factors provides a valid basis for distinguishing *Alexander*. Although it is true that the informant in *Alexander* was offered no reward in exchange for information, the same is true of Pladsen in the present case. Weaver testified that he offered Pladsen no benefits or deals. Similarly, Pladsen testified that Weaver had offered him no benefits and, in fact, told him that he lacked authority to do so, and the trial court credited that testimony. This court cannot second-guess that credibility determination on appeal. See part III of this opinion.

I also disagree that *Alexander* is inapplicable merely because the informant in that case was not an inmate. As I explain more fully in part III of this opinion, courts have consistently recognized that, although the fact of incarceration is relevant to whether the statements were ‘‘deliberately elicited,’’ it is not relevant to whether the informant was an agent. See, e.g., *United States* v. *Watson*, supra, 894 F.2d 1347–48.

Moreover, I do not subscribe to the view that the informant in *Alexander* had less of an incentive to cooperate with the police than Pladsen (or the average jailhouse informant) and, thus, could not as easily become an agent of the state, merely because he was not incarcerated. Although inmates have obvious incentives to obtain information from fellow inmates to provide to the police, individuals who are not incarcerated often have strong incentives of their own to cooperate with law enforcement. See *State* v. *Bruneau*, 131 N.H. 104, 110, 552 A.2d 585 (1988) (Souter, J.) (observing that inducement giving rise to agency relationship under *Massiah* ‘‘may derive its force from any one of a wide variety of [third-party] interests: the good citizen may respond from a sense of civic obligation, while the common informer may be looking for prosecutorial leniency or even payment in cash’’). Indeed, there was evidence that this was especially true of the informant in *Alexander*, who was friends with the missing victim that the defendant had admitted to murdering, and whose visits with the defendant admittedly were ‘‘motivated, at least in part, by a feeling of responsibility toward the police.’’ *State* v. *Alexander*, supra, 197 Conn. 182, 187. I would not provide incarcerated defendants with diminished sixth amendment protections merely because the informant who seeks information from them is not a fellow inmate.

State *v.* Ashby

mant in one of those unrelated cases, the inmate had numerous conversations with the defendant, during which the defendant made incriminating statements. Id., 853. This court held that the inmate was not an agent of the state when he obtained these statements because the police had given him "no instructions whatsoever . . . that he was to gather information about crimes . . . or that he would be rewarded if he provided any such information." (Internal quotation marks omitted.) Id., 858. This court emphasized that, in the absence of any such directive or promise, "a trial court [correctly] may determine that an informant was not so much a government agent . . . as he was an entrepreneur who hoped to sell information to the government." (Internal quotation marks omitted.) Id.; see also *State* v. *Lasaga*, supra, 269 Conn. 466 (private citizen was not state agent when police promised him no favors in return for cooperation); *State* v. *Gordon*, supra, 197 Conn. 422–23 (private citizen was not state agent when there was no evidence to support claim of "implied exchange of promises [to] obtain information for the state" in exchange for benefit).

Consistent with *Alexander* and *Swinton*, courts in other jurisdictions similarly recognize that some type of state directive or promise is an essential prerequisite to an agency relationship under *Massiah*. "Although there are some differences in the approaches of the various jurisdictions, they are unified by at least one common principle: to qualify as a government agent, the informant must at least have some sort of agreement with, or act under instructions from, a government official." *Manns* v. *State*, 122 S.W.3d 171, 183–84 (Tex. Crim. App. 2003); see, e.g., *United States* v. *Ocean*, 904 F.3d 25, 33 (1st Cir. 2018) ("[a] successful *Massiah* objection requires a defendant to show, at a bare minimum, that the person with whom he conversed had previously been enlisted for that purpose by the authorities" (internal quotation marks omitted)), cert. denied

State *v.* Ashby

sub nom. *Mitchell* v. *United States*, U.S. , 139
S. Ct. 931, 202 L. Ed. 2d 656 (2019), and cert. denied,
U.S. , 139 S. Ct. 1362, 203 L. Ed. 2d 596 (2019);
*Creel* v. *Johnson*, supra, 162 F.3d 394 (''[i]n the absence
of a quid pro quo between [the informant] and [the
police], and in the absence of instruction or control
by the [s]tate, we hold that [the informant] was not a
government agent''); *United States* v. *Birbal*, 113 F.3d
342, 346 (2d Cir.) (''[o]ther circuits agree that an infor-
mant becomes a government agent . . . only when the
informant has been instructed by the police to get infor-
mation about the particular defendant''), cert. denied,
522 U.S. 976, 118 S. Ct. 433, 139 L. Ed. 2d 333 (1997);
*United States* v. *Brink*, 39 F.3d 419, 423 (3d Cir. 1994)
(''[a]n inmate who voluntarily furnishes information
without instruction from the government is not a gov-
ernment agent''); *Depree* v. *Thomas*, 946 F.2d 784, 794
(11th Cir. 1991) (''[a]t a minimum . . . there must be
some evidence that an agreement, express or implied,
between the individual and a government official
existed at the time the elicitation takes place''); *Com-
monwealth* v. *Foxworth*, 473 Mass. 149, 158, 40 N.E.3d
1003 (2015) (''[a]n individual's actions will not be attrib-
uted to the [s]tate if no promises are made for that
individual's help and if nothing was offered to or asked
of that individual'' (emphasis omitted; internal quota-
tion marks omitted)).[11]

---

[11] The majority cites a number of cases that, in its view, support the
proposition that the ''must have known'' standard from *Henry* governs the
agency analysis. I respectfully disagree with the majority's characterization
of these cases. Although a number of them discuss *Henry*, none of them
holds, as the majority does today, that an informant becomes a government
agent merely because the police ''must have known'' that their conversation
with an informant might result in that informant's seeking information from
the defendant. Rather, consistent with the case law cited in the body of this
opinion, these cases all recognize that the critical inquiry is whether the
informant was acting pursuant to an express or implied agreement with
police. See *Ayers* v. *Hudson*, 623 F.3d 301, 310–16 (6th Cir. 2010) (observing
that agency may be established with evidence of either explicit directive to
obtain information or ''implied agreement,'' and concluding that agency had
been demonstrated by evidence showing that informant and police ''were

State *v.* Ashby

In adopting this new "must have known" standard from *Henry*, under which there need not be any showing that the officer expressly or tacitly asked for information or offered a benefit in exchange for it, the majority impliedly overrules all of this court's aforementioned agency decisions, which had explicitly recognized these elements as the minimum requirements needed to establish an agency relationship under *Massiah*. In my view, this prior approach, which is fully consistent with decisions from other jurisdictions, "gives better guidance to law enforcement authorities" about "what they can or cannot do"; *United States* v. *LaBare*, 191 F.3d 60, 65 (1st Cir. 1999); than the amorphous "must have known" test that the majority announces today.

working in conjunction with each other" to elicit information from defendant); *Randolph* v. *California*, 380 F.3d 1133, 1139, 1144 (9th Cir. 2004) (characterizing *Henry* as case addressing deliberate elicitation prong of *Massiah* and concluding that informant acted as state agent when police had returned him to cell that he shared with defendant after he had met multiple times with state officials to provide incriminating information about defendant, because evidence demonstrated that state "made a conscious decision to obtain [the informant's] cooperation and that [the informant] consciously decided to provide that cooperation"); *Matteo* v. *Superintendent, SCI Albion*, 171 F.3d 877, 893 (3d Cir.) (characterizing decision in *Henry* as case in which informant was found to be agent "because he was paid and acting under instructions from the government," and noting that *Henry* did not "generalize these factors into a rule defining government agency for future cases" (internal quotation marks omitted)), cert. denied sub nom. *Matteo* v. *Brennan*, 528 U.S. 824, 120 S. Ct. 73, 145 L. Ed. 2d 62 (1999); *United States* v. *Johnson*, 4 F.3d 904, 912 (10th Cir. 1993) (holding that informant was not state agent because government offered no benefit in exchange for informant's cooperation, did not direct informant, and did not assist informant in eliciting statements), cert. denied, 510 U.S. 1123, 114 S. Ct. 1082, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Carroll* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Nottingham* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994); *Depree* v. *Thomas*, supra, 946 F.2d 794 ("[a]t a minimum . . . there must be some evidence that an agreement, express or implied . . . existed"); *Thomas* v. *Cox*, supra, 708 F.2d 137 (admonition by police to informant to "listen but don't ask" does not establish agency "with no express or implicit quid pro quo undergirding it" (internal quotation marks omitted)).

336 Conn. 452 APRIL, 2021 527

State *v.* Ashby

I would therefore adhere to the agency standard employed in this court's prior decisions. With that standard in mind, I turn to an analysis of the evidence in the present case.

## II

## ANALYSIS

In my view, and in light of the authorities discussed in part I of this opinion, there is substantial evidence in the record to support the trial court's finding that Pladsen was not acting as a state agent when he elicited the incriminating information from the defendant. Indeed, Pladsen's testimony at the suppression hearing, which this court is bound to accept on appeal because the trial court credited it; see, e.g., *State* v. *DeMarco*, supra, 311 Conn. 519–20; is itself sufficient to support the trial court's finding because it directly undermines the essential requirements of agency. Pladsen testified that he and Weaver entered into no "agreement of any sort," including by "implication."[12] Pladsen further testified that Weaver did not offer him any benefits but had

---

[12] Pladsen testified:

"[Defense Counsel]: When Detective Weaver gave you his business card with the numbers you described, is it correct it was your understanding that if you were to obtain any information about [the defendant] that you were to contact him?

"[Pladsen]: *I don't think that would be a proper way of saying it because that implies that we had some type of an agreement.* What I would say that what [Weaver] did was hey . . . if you want to contact me again, because like I told you some of the time when he was up there we just kind of talked about . . . different things like . . . he was telling me about the Internet because I've never seen the Internet . . . I don't know what that's about. So he was kind of friendly, but it could have been for just a casual conversation. There was nothing implied one way or the other. It's not saying he would come up and b[e] my friend. I'm not saying that either, *but I'm saying it wasn't implied one way or the other. There was no implication and there was no contractual agreement of any sort.*

"[Defense Counsel]: Didn't have a meeting of the minds?

"[Pladsen]: *Right. . . . There's no meeting of the minds, no.*" (Emphasis added.)

State *v.* Ashby

in fact made "very clear" that he "wasn't allowed to make any deals" or "do anything" without authorization from the Office of the State's Attorney.[13] See, e.g., *United States* v. *Johnson*, 4 F.3d 904, 912 (10th Cir. 1993) (there was no agency relationship when government indicated it was offering no benefit in exchange for information), cert. denied, 510 U.S. 1123, 114 S. Ct. 1082, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Carroll* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Nottingham* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994); *Commonwealth* v. *Foxworth*, supra, 473 Mass. 158 (jailhouse informant was not state agent when police told him they lacked authority to enter into any agreements with him and that no promises were being made).

Furthermore, Pladsen testified that Weaver did not direct him to take any action relative to the defendant and that he decided to elicit the incriminating information *on his own accord*:

"[The Prosecutor]: With respect to any of those actions . . . up to the point when [the defendant] gave you the [note] or even [when] subsequently talking to [the defendant] again this week, did Detective Weaver ever direct you to do anything relative to [the defendant]?

"[Pladsen]: No.

"[The Prosecutor]: *You did this on your own*?

"[Pladsen]: *Yes.*

\* \* \*

"[Defense Counsel]: Did you talk to Detective Weaver about different ways to obtain information from [the defendant]?

---

[13] Likewise, Weaver testified that he made "clear" to Pladsen that he lacked authority to enter into any deals or offer any benefits of any kind.

State *v.* Ashby

"[Pladsen]: No. No, not at all.

"[Defense Counsel]: Did Detective Weaver ever speak to you about getting information from [the defendant] by asking him questions about his cases?

"[Pladsen]: No. He never told me to ask [the defendant] questions about his cases." (Emphasis added.)

In fact, Pladsen testified that, when he asked Weaver if he should obtain information from the defendant, Weaver told him to "just wait" until he could speak to the Office of the State's Attorney to determine how, or if, to proceed. Despite this admonishment, and despite not having communicated directly any further with Weaver for several months, Pladsen took it upon himself to convince the defendant to write a note containing details about the crime under the guise that Pladsen would use it to discredit Weaver as a trial witness. Regarding his decision to seek the note, Pladsen testified:

"[Defense Counsel]: And was it your testimony that it was your idea to try to get [the defendant] to write something down?

"[Pladsen]: Yes. It was. It was kind of a spur of the moment type of thing. It wasn't like I planned on like doing it, but the opportunity presented itself, so I took advantage of it if you want to say."

Pladsen's testimony conclusively demonstrates that he did not elicit the information in response to any express or implied agreement with or directive from Weaver. Rather, Pladsen obtained the information on his own initiative, or, as Pladsen put it, "on [his] own," as a "spur of the moment" decision he made when "the opportunity presented itself . . . ." This testimony alone permitted the trial court to find that Pladsen "was not so much a government agent . . . as he was an entrepreneur who hoped to sell information to the government." (Internal quotation marks omitted.) *State* v.

State *v.* Ashby

*Swinton*, supra, 268 Conn. 858; see also *United States* v. *Birbal*, supra, 113 F.3d 346 ("[t]he [s]ixth [a]mendment rights of a talkative inmate are not violated when a jail-mate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant"); *United States* v. *York*, supra, 933 F.2d 1356 (*Massiah* is not violated when "an individual, acting on his own initiative, deliberately elicits incriminating information" (internal quotation marks omitted)).

Moreover, the state's minimal contact with Pladsen and lack of control over his activities provides even further support for the trial court's finding that he was not acting as an agent of the state. See *Thomas* v. *Cox*, supra, 708 F.2d 137 (single meeting between inmate and officer, at which officer instructed inmate to listen but not to ask questions, did not demonstrate "requisite degree of . . . ongoing cooperation between [the] state and [the] witness required to implicate the state"[14] (internal quotation marks omitted)). Indeed, the police involvement in the present case was far less extensive than the officer provided "transportation service" that this court held was insufficient to establish agency in *State* v. *Alexander*, supra, 197 Conn. 186–87. See part I B of this opinion.

Pladsen and Weaver had a single meeting on January 5, 2007. The police did not seek out Pladsen. It was Pladsen who initiated the meeting by representing in his December 27, 2006 letter to Weaver that he had

[14] In this case, the question of whether an officer's instruction to "listen but not ask questions" is sufficient to create an agency relationship is not at issue. Unlike the officer in *Thomas*, Weaver did not instruct Pladsen to listen for information, or to do anything relative to the defendant. Weaver testified that he merely told Pladsen that he "would be willing to listen" to any information Pladsen wanted to provide. The present case thus, presents an even weaker case for agency than the one rejected by the United States Court of Appeals for the Fourth Circuit in *Thomas*. See footnotes 15 and 18 of this opinion.

State *v.* Ashby

incriminating information he wanted to provide. Pladsen had no history of serving as an informant, and Weaver was completely unaware of Pladsen until receiving his letter. The police also did not put Pladsen in a position to obtain information from the defendant. They were uninvolved in placing Pladsen in the cell next to the defendant, and no one instructed Pladsen to cultivate a relationship with him. Moreover, following their meeting, Weaver had no control over whether, or how, Pladsen interacted with the defendant. See, e.g., *United States* v. *Li*, 55 F.3d 325, 328 (7th Cir. 1995) (cooperating witness was not government agent when "[t]he evidence demonstrated no government control over [the witness'] actions; most importantly, there was no control over [the witness'] decision to arrange a meeting with [the defendant]"); *United States* v. *Surridge*, 687 F.2d 250, 255 (8th Cir.) (there was no *Massiah* violation when "[the] police do nothing to direct or control or involve themselves in the questioning"), cert. denied, 459 U.S. 1044, 103 S. Ct. 465, 74 L. Ed. 2d 614 (1982).

I recognize that, as the majority points out, there were certain aspects of Weaver's meeting with Pladsen that could serve as evidence of the existence of an implied agency relationship. See, e.g., *Ayers* v. *Hudson*, 623 F.3d 301, 311–12 (6th Cir. 2010) (agency may be established through implicit conduct because, otherwise, "the [s]tate [could] accomplish with a wink and a nod what it cannot do overtly" (internal quotation marks omitted)); *Commonwealth* v. *Foxworth*, supra, 473 Mass. 158 ("[a]n agency relationship may arise other than by express agreement, and may evolve . . . by implication from the conduct of the parties" (internal quotation marks omitted)). Specifically, Weaver told Pladsen that the police were "always interested" in and would "listen" to verifiable information, asked Pladsen if he would be willing to wear a wire at some point in the future, and left Pladsen with his contact information.

State *v.* Ashby

In light of the entire record, however, these facts do not justify overturning the trial court's finding that Pladsen was not a state agent. First, none of these statements or actions amounts to an express or implied request for information or offer of a benefit.[15] Second, and most important, Pladsen's testimony demonstrates that he did not interpret Weaver's actions as tacitly suggesting that he should obtain information from the defendant or that he would receive a benefit for doing so.[16] Pladsen testified that he and Weaver had no mutual understanding or "meeting of the minds," and that "there was nothing implied . . . there was no implication, and there was no contractual agreement of any sort." Pladsen further testified that Weaver never told him to ask the defendant questions about Weaver's cases or to "do anything relative to" the defendant, that he obtained the information from the defendant "on [his] own," and that Weaver had made it "very clear" that he "couldn't do anything" or offer any benefits.[17]

---

[15] Any reliance on Weaver's statement that the police were "always interested" in and would "listen" to verifiable information as proof of agency is especially dubious because it is not even clear that Weaver made this statement in reference to information Pladsen might obtain in the future, as opposed to information Pladsen had already obtained but was withholding from Weaver. Weaver testified that he had the impression that Pladsen "knew more" about the victim's murder than he had let on during their meeting.

[16] Even if Pladsen had subjectively believed that any of Weaver's statements constituted requests for information, it is unclear that such a belief, alone, would have created an agency relationship. See *Fairbank* v. *Ayers*, 650 F.3d 1243, 1256 (9th Cir. 2011) ("even if [the informant] subjectively believed that the officer's statement [that he was looking for the murder weapon] was a request [for that information], this does not constitute the requisite state involvement"), cert. denied, 565 U.S. 1276, 132 S. Ct. 1757, 182 L. Ed. 2d 558 (2012).

[17] Weaver's admonishment that he lacked authority to provide any deals or benefits evidently had an impact on Pladsen. At the defendant's trial, a few days after the suppression hearing, Pladsen testified:

"[Defense Counsel]: And am I correct that as you sit there now today, you're still hoping for some sort of benefit?

"[Pladsen]: No. [Weaver] made it perfectly clear to me that he's not authorized to do anything of the [sort] on that."

State *v.* Ashby

Whether this court believes Pladsen's testimony that Weaver had not implied to him that he would receive a benefit in exchange for information is beside the point. The trial court credited Pladsen's testimony, and this court must defer to that credibility assessment on appeal.[18] I see nothing in the record to suggest that Pladsen's testimony that he and Weaver entered into no express or implied quid pro quo was false or mistaken. Indeed, Weaver's account of the meeting was fully consistent with Pladsen's account in this regard.[19]

On the basis of this evidence—Pladsen's testimony that he was acting on his own initiative rather than in response to an express or implied agreement with or directive from the state, and the absence of any signifi-

---

[18] I note that courts have frequently held that, in the absence of an express or implied agreement, generalized instructions to listen for information are insufficient to demonstrate agency. See, e.g., *State* v. *Alexander*, supra, 197 Conn. 186 ("[t]he police had simply asked [the informant] to let them know if he heard anything . . . [and] that request alone did not create an agency relationship"); see also *Thomas* v. *Cox*, supra, 708 F.2d 137 (admonition to " 'keep your ears' open or to 'listen but don't ask' " was insufficient to establish agency "with no express or implicit quid pro quo undergirding it"). As I have emphasized; see footnote 14 of this opinion; the facts of the present case fall even further short of establishing agency than those at issue in these prior decisions because Weaver did not instruct Pladsen to listen for information (or to do anything at all) but merely said that he generally would be willing to listen to whatever information Pladsen was willing to provide.

[19] The majority relies on the Superior Court's decision in *State* v. *Howell*, Superior Court, judicial district of New Britain, Docket No. CR-05-222048-S (January 30, 2007) (*Sheldon, J.*), but that case is nothing like the present case. First, the Superior Court in *Howell*, as a trial court viewing the evidence on a clean slate, was required to conduct a plenary review of the evidence and independently determine whether the informant was a state agent. In the present case, however, our appellate review of the trial court's finding that Pladsen was not an agent is far more circumscribed, both by the substantial evidence rule and by the trial court's credibility findings. Second, the facts of *Howell* are distinguishable. In *Howell*, during a telephone conversation with the informant, the officer affirmatively instructed the informant to listen to incriminating information the defendant was providing, and *even told the informant that their conversation had made him an agent of the state*. See id. There are no such facts in the present case.

cant police involvement or control—there is substantial evidence in the record to support the trial court's finding that Pladsen was not acting as an agent of the state when he elicited the incriminating information from the defendant.[20]

## III

## THE MAJORITY'S ANALYSIS

Even accepting the majority's premise that agency depends on whether Weaver "knew or should have known" that his meeting with Pladsen was likely to cause Pladsen to attempt to elicit additional information from the defendant, I disagree that such a standard has been satisfied in the present case. As previously explained, Weaver gave Pladsen no directives and offered him no rewards, and even ignored his calls in the months following their meeting. Nor is there any evidence that Pladsen ever informed Weaver that he intended to obtain information from the defendant. This is a far cry from *Henry*, in which the government had

---

[20] The majority contends that, even if Pladsen had not become a state agent as a result of his January 5, 2007 meeting with Weaver, "surely, such a relationship would have been established after Pladsen offered, and the state affirmatively accepted," the note that Pladsen elicited from the defendant. Footnote 34 of the majority opinion. After Pladsen read the note to Weaver over the telephone, Pladsen was confronted by the defendant, who was angry that Pladsen had given the note to Weaver and asked Pladsen to falsely claim authorship of the note. The majority contends that the elicitation of this statement itself constitutes a *Massiah* violation that independently justifies a reversal of the defendant's convictions. Id. I disagree.

There is no evidence that Weaver said or did anything during that call with Pladsen to suggest that he wanted Pladsen to obtain any additional information from the defendant. Weaver merely accepted the information Pladsen provided to him, which does not establish agency. See *State* v. *Willis*, supra, 496 S.W.3d 712–13 ("[t]he government's willing acceptance of information provided . . . by an . . . informant did not make the informant the government's agent under the [s]ixth [a]mendment" (internal quotation marks omitted)); *Manns* v. *State*, supra, 122 S.W.3d 189 (government's "accept[ance] [of] the information [the informant] had to offer" was insufficient to establish agency).

State *v.* Ashby

a long-standing agreement with the informant to pay him only when he obtained favorable information and specifically directed the informant to approach the defendant and to attempt to obtain incriminating statements.[21] See *United States* v. *Henry*, supra, 447 U.S. 266, 270.

In concluding otherwise, the majority contends, first, that Pladsen's meeting with Weaver "appears to have focused Pladsen's efforts" on this particular case, as opposed to the defendant's other then pending criminal matters. I disagree that this is a fair inference on this record. Neither Weaver nor Pladsen testified to this effect. Although they discussed the defendant's case during their meeting, there is no evidence that Weaver was the one to bring it up or that the information Pladsen had hoped to convey to Weaver during this meeting concerned only unrelated cases.

To the contrary, the record suggests that the opposite inference is far more reasonable. Pladsen's letter to Weaver dated December 27, 2006, stated that Pladsen had "some information that could be very useful to [him] and one of [his] cases." The investigation of the victim's murder was one of Weaver's cases, and Weaver testified at the suppression hearing that, during their meeting, Pladsen provided him with information that Pladsen *had already obtained* about the victim's murder. This strongly suggests that the "information" Pladsen offered to provide to Weaver in the letter concerned

---

[21] I respectfully disagree with the majority's suggestion that "Weaver told Pladsen that he was interested in hearing new evidence relating to the victim's death . . . ." I see no evidence of any such statement in the record. Although Weaver asked if Pladsen would be willing to wear a wire sometime in the future should the Office of the State's Attorney authorize such an operation, this is hardly the same thing as telling Pladsen that he himself was "interested in hearing new evidence" about the victim's death. Again, Pladsen's own testimony at the suppression hearing demonstrates he did not interpret Weaver's comment in this manner. See part II of this opinion.

State *v.* Ashby

this case.[22] Moreover, Weaver testified that Pladsen had
asked whether he would receive a benefit if he provided
information "about the [victim's] investigation," sug-
gesting that *Pladsen* was the one to broach the topic.

On this same point, the majority goes on to conclude
that Pladsen's discussion with Weaver must have sug-
gested to Pladsen that "the state was principally inter-
ested in objectively verifiable forms of evidence regard-
ing the defendant's involvement in this particular case,
such as a recording or writing," and that, "[a]lthough
Weaver made no explicit requests during this meeting,
the handwritten note that Pladsen ultimately produced
during the state's case-in-chief mirrored those require-
ments precisely." The majority appears to suggest that
the similarities between what Pladsen and Weaver dis-
cussed, and what Pladsen ultimately obtained, indicate
that Weaver had specifically requested that information.
I disagree.

The note hardly "mirror[s]" what Pladsen and Weaver
discussed in their meeting; it may be *consistent* with
what was discussed, but only on the most general of
levels, i.e., it concerned this case and was "verifiable"
in that it was handwritten by the defendant, as opposed
to being based on Pladsen's word alone. This does not
evidence the existence of an agency relationship. If
Weaver had mentioned a *specific* detail in the case,
such as the type of weapon used in the murder, and
Pladsen returned with information about that specific
detail, it might have suggested that Weaver had
requested that information. See *Ayers* v. *Hudson*, supra,
623 F.3d 315–16 (inferring agency relationship when
informant "knew exactly what questions to ask [the

---

[22] The majority contends that Pladsen's December 27, 2006 letter to Weaver
"referenced only unrelated criminal charges." Although the majority is cor-
rect in noting that certain other references in the letter concerned unrelated
cases; see footnote 30 of the majority opinion; there is no indication that
Pladsen's reference to "information that might be very useful" was not
related to this case.

State *v.* Ashby

defendant] regarding the details of the murder'' after meeting with police). Nothing of the sort occurred here; Pladsen and Weaver discussed the victim's case in only general terms. In any event, Pladsen's testimony at the suppression hearing forecloses any claim that Weaver suggested that he obtain any information, verifiable or otherwise, from the defendant. See part II of this opinion.

Second, the majority places substantial significance in the fact that Pladsen "sought assurance from Weaver that a benefit would be made available in exchange for his cooperation.'' The fact that Pladsen hoped or even expected to receive a benefit, however, did not render him an agent. "We must not confuse speculation about [an informant's] motives for assisting the police for evidence that the police promised [the informant] consideration for his help or, otherwise, bargained for his active assistance. [The informant's] motives alone cannot make him an agent of the police even if the police knew and understood that his motives probably were self-serving and related to getting police cooperation in his own case.'' *Lightbourne* v. *Dugger*, 829 F.2d 1012, 1021 (11th Cir. 1987), cert. denied, 488 U.S. 934, 109 S. Ct. 329, 102 L. Ed. 2d 346 (1988). Indeed, "most inmates who provide information to law enforcement officials harbor the hope that their service will not go unrewarded. . . . That inmates realize there is a market for information about crime does not make each inmate who enters the market a government agent.'' (Citation omitted.) *United States* v. *York*, supra, 933 F.2d 1357; see also *State* v. *Swinton*, supra, 268 Conn. 858–59.

Relatedly, the majority appears to suggest that Weaver encouraged Pladsen's hope of receiving a benefit. As the basis for this assertion, the majority contends that, although Weaver told Pladsen that he could not offer any deals or benefits, Weaver "(1) informed Pladsen that the Office of the State's Attorney would have

State *v.* Ashby

to approve any 'deals,' and (2) made Pladsen 'generally aware' of the fact that 'any information received' would be conveyed to the Office of the State's Attorney." I disagree.

Even if Weaver had said these things to Pladsen, which is not clearly borne out by the record,[23] it would not change the analysis. Courts have addressed similar statements and held that, without more, they do not establish agency. See, e.g., *United States* v. *Taylor*, 800 F.2d 1012, 1015 (10th Cir. 1986) (statements to jailhouse informant that information about cooperation would be "passed on" to appropriate authorities were insufficient to demonstrate agency in absence of agreement or offer of benefit (internal quotation marks omitted)),

---

[23] I disagree with the majority that the record reflects that Weaver made either of these statements to Pladsen. As to the first statement, Weaver testified that he never mentioned to Pladsen anything about what the Office of the State's Attorney "could or could not do" in terms of approving deals or offering benefits.

As to the second statement, the record is, at best, unclear as to whether Weaver told Pladsen that he would convey any information he received to the Office of the State's Attorney. Pladsen testified that Weaver did not make any such statement. Weaver testified to similar effect but was somewhat equivocal. He testified:

"[Defense Counsel]: Did you indicate to . . . Pladsen that you would report any information you got from him to the [Office of the State's Attorney]?

"[Weaver]: No.

"[Defense Counsel]: Didn't make that clear to him?

"[Weaver]: No. I didn't tell him that, if you tell me something right now, I'm going to go back and tell the [Office of the State's Attorney]. I listened to what he had to say.

"[Defense Counsel]: Isn't it a fact that you indicated to him that any contact you had with him would have to be reported to [the Office of the State's Attorney]?

"[Weaver]: I did tell him that because I wanted to make sure that the [Office of the State's Attorney] knew that I was having contact with someone about an ongoing case they're investigating, so I thought it was important.

"[Defense Counsel]: All right. So you made him generally aware that any contact you had and any information received would go to the [Office of the State's Attorney]?

"[Weaver]: Yes."

State *v.* Ashby

cert. denied, 484 U.S. 838, 108 S. Ct. 123, 98 L. Ed. 2d 81 (1987); *Commonwealth* v. *Foxworth*, supra, 473 Mass. 157–58 (there was no implied agency, despite police statements to jailhouse informant that information provided would be forwarded to officials with deal-making capacity, when police made no express or implied promises).

If anything, the record reflects that Pladsen was merely acting in accordance with his own long-standing desire to curry favor with law enforcement when he elicited the statements from the defendant. In August, 2006, months before meeting with Weaver, Pladsen began cultivating a relationship with the defendant for the specific purpose of using that relationship to coax the defendant into divulging incriminating information that he could then provide to law enforcement in exchange for favorable treatment. Once Pladsen did so, he initiated the meeting with Weaver, hoping Weaver could help him secure a reduction in the twenty-five year sentence he was serving for assaulting a prison guard.

Far from encouraging that hope, Weaver made "clear" to Pladsen that he could not provide him with any deals or benefits. Pladsen testified that this admonishment had the effect of *discouraging* any hope or expectation that he would receive anything in exchange for his cooperation. See footnote 17 of this opinion and accompanying text. Moreover, Pladsen testified—and the trial court credited—that he obtained the information from the defendant on his own accord. Accordingly, it is pure speculation to conclude, on this record, that "the animating force for securing [the] information [was] . . . attributable to the [state]"; *Schmitt* v. *True*, 387 F. Supp. 2d 622, 640 (E.D. Va. 2005), aff'd sub nom. *Schmitt* v. *Kelly*, 189 Fed. Appx. 257 (4th Cir.), cert. denied, 549 U.S. 1028, 127 S. Ct. 577, 166 L. Ed. 2d 425 (2006); rather than to Pladsen's own preexisting,

State *v.* Ashby

subjective hope that he might obtain a benefit. Pladsen conducted himself exactly the same way before his meeting with Weaver as he did after it.

Third, the majority contends that the fact that the state did not object to Pladsen's subsequent attempt to obtain a reduction in his sentence is relevant because it amounts to the provision of a benefit. Under the specific circumstances of the present case, I disagree. To have any bearing on the agency analysis, the benefit must have "already been promised at the time the informant elicited the information; if not, later receipt of a benefit is of no consequence." *Manns* v. *State*, supra, 122 S.W.3d 188; see also *Creel* v. *Johnson*, supra, 162 F.3d 393 (decision of police not to prosecute was irrelevant to agency because there was no evidence that "anyone promised . . . not to pursue [the] charges *in exchange for* [the informant's] assistance" (emphasis added)); *Lightbourne* v. *Dugger*, supra, 829 F.2d 1020–21 (agreement to assist informant in obtaining bail did not create agency relationship because it was not made until after informant elicited incriminating statements); *Commonwealth* v. *Foxworth*, supra, 473 Mass. 158–59 (fact that informant received favorable treatment was irrelevant to agency "[in the absence of] evidence that such treatment had been promised in exchange for information yet to be obtained").

Although I agree with the majority that the subsequent receipt of a benefit can, under some circumstances, serve as circumstantial evidence that an agency relationship previously had existed, or that the benefit previously had been offered, the record in this case forecloses any such inference. Pladsen's testimony at the suppression hearing, which, again, this court must accept because the trial court credited it, was that Weaver offered him no benefits during their January 5, 2007 meeting. Weaver testified to the same effect. Weaver and Pladsen had no further direct communications until months later, *after* Pladsen had obtained the note.

State *v.* Ashby

Moreover, Pladsen testified at the defendant's trial that he was not expecting to receive a benefit because Weaver had disclaimed any authority to provide him with any benefit. See footnote 17 of this opinion. This evidence demonstrates that any benefit Pladsen ultimately received for his assistance had not been offered to him before he elicited the incriminating information from the defendant. In fact, this evidence strongly suggests that the state's *decision* to provide Pladsen with a benefit had not even been made until after he obtained the statements. Accordingly, Pladsen's later receipt of a benefit does not provide any evidence of agency.

Finally, the majority relies on the fact that the defendant was incarcerated when Pladsen elicited the incriminating statements from him. The majority cites the United States Supreme Court's observation in *United States* v. *Henry*, supra, 447 U.S. 274, that "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover [g]overnment agents." The fact of custody, however, although relevant to the deliberate elicitation prong of a *Massiah* claim, has no bearing on the threshold question of agency, which focuses not on the susceptibility of the defendant to ploys, but on the "extent of police involvement with the informant." *State* v. *Alexander*, supra, 197 Conn. 184.

Indeed, the United States Supreme Court clarified in a footnote that "the fact of custody bears on whether the [g]overnment 'deliberately elicited' the incriminating statements from [the defendant]." *United States* v. *Henry*, supra, 447 U.S. 274 n.11. Relying on this footnote, the United States Court of Appeals for the District of Columbia held that "it is of no moment that the incriminating conversations took place while the accused was incarcerated" because the fact of custody is relevant only to the question of deliberate elicitation and "does

not bear [on] the anterior question whether th[e] [informant] was acting on behalf of the [g]overnment [which] depends solely [on] whether he was acting [on] the instruction of a government official.'' *United States* v. *Watson*, supra, 894 F.2d 1347–48; see also *United States* v. *Johnson*, 196 F. Supp. 2d 795, 855, 860 (N.D. Iowa 2002) (fact that defendant was in custody demonstrated deliberate elicitation but was not relevant to agency), rev'd on other grounds, 338 F.3d 918 (8th Cir. 2003); *Wallace* v. *Price*, Docket No. 99-231, 2002 WL 31180963, *68 and n.54 (W.D. Pa. October 1, 2002) (fact of custody relates to "the mental state of the defendant, his vulnerability while incarcerated, his susceptibility to artifice, and the likelihood that he will expose incriminating information to others," none of which is relevant to agency); *State* v. *Willis*, supra, 496 S.W.3d 714 (fact of incarceration "do[es] not bear on the question of whether [the informant] was acting as a government agent").[24] The fact that the defendant was in custody when Pladsen elicited the incriminating information from him, although pertinent to whether the statements were deliberately elicited, is simply not relevant to the question of whether Pladsen was an agent of the state.

For these reasons, I see no basis in the record to conclude that Weaver knew or should have known that

---

[24] Although the Third Circuit Court of Appeals suggested that custody is relevant to the agency analysis in *Matteo* v. *Superintendent, SCI Albion*, 171 F.3d 877, 894–95 (3d Cir.), cert. denied sub nom. *Matteo* v. *Brennan*, 528 U.S. 824, 120 S. Ct. 73, 145 L. Ed. 2d 62 (1999), this aspect of *Matteo* has been widely criticized as being based on a misreading of *Henry*. See *United States* v. *Johnson*, supra, 196 F. Supp. 2d 855, 860 (generally relying on *Matteo* but noting that "[t]he court in *Matteo* may have gone too far" when it considered custody as relevant to agency); *Wallace* v. *Price*, supra, 2002 WL 31180963, *68 and n.54 (considering factors relied on in *Matteo* but declining to grant weight to custody); *State* v. *Willis*, supra, 496 S.W.3d 713 n.22 ("We note that the [lower court] correctly cited *Matteo* as stating that [the fact of custody was] pertinent to the question of whether the informant was a government agent. . . . We disagree with this portion of *Matteo*'s analysis, as *Matteo* . . . incorrectly cited *Henry* for the proposition that [this factor was] pertinent to the question of agency, rather than the question of interrogation or deliberate elicitation." (Citation omitted.)).

State *v.* Ashby

his meeting with Pladsen or his subsequent telephone call with him; see footnote 20 of this opinion; as opposed to Pladsen's obvious own preexisting desire to provide the police with information in exchange for leniency, was likely to result in Pladsen's seeking further information from the defendant. Accordingly, I would not conclude that Pladsen was a state agent, even under the majority's new formulation of the agency standard.

IV

CONCLUSION

In summary, courts should always scrutinize law enforcement's dealings with jailhouse informants to ensure that the state is not circumventing criminal defendants' sixth amendment rights by "a wink and a nod . . . ." *Ayers* v. *Hudson*, supra, 623 F.3d 312. At the same time, not every encounter between the police and an inmate establishes an agency relationship so as to render inadmissible any incriminating information that the inmate subsequently obtains from the defendant. "[A]ll citizens . . . have a duty to report information about criminal activities, and [although] the [s]ixth [a]mendment may limit the government's ability to *encourage* such reporting behavior, the government should not be required to actively *discourage* such behavior either." (Emphasis in original; internal quotation marks omitted.) *State* v. *Willis*, supra, 496 S.W.3d 713; see also *United States* v. *Johnson*, supra, 4 F.3d 912 ("we decline to handicap legitimate investigations by assuming that any time the government is approached by a would-be informant and eventually uses evidence obtained by that informant, an implicit agency relationship is established"); *United States* v. *Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982) (rejecting argument that "[g]overnment must go to extraordinary lengths to protect defendants from their own loose talk").

State *v.* Ashby

Under today's decision, which holds that the trial court was required to find agency even though the state did not affirmatively request information from Pladsen or offer any benefit in exchange for that information, virtually every inmate who seeks out a state official to provide information will be regarded as having become an agent of the state unless the official responds with complete silence or affirmatively dissuades the inmate from seeking further information.[25] See *Thomas* v. *Cox*, supra, 708 F.2d 137 (declining to find agency on basis of single meeting between police and inmate at which no offers or promises were made, because "[t]o do so would be in practical effect to establish the principle that any voluntary proffer of inmate informer assistance not met with silence or actually repudiated by state officials would make inadmissible any inculpatory disclosures . . . subsequently made by an accused," which neither *Henry* nor sixth amendment requires). In my view, this stretches *Massiah* too far.

For the foregoing reasons, I would conclude that the trial court's finding that Pladsen was not acting as an agent of the state is supported by substantial evidence.

Accordingly, I respectfully dissent in part.

––––––––––––––––––

[25] I endorse the majority's assurance in footnote 24 of its opinion that some affirmative action on the part of the state is necessary in order to establish an agency relationship. I find it difficult, however, to reconcile this assurance with the majority's analysis in the present case, which relies in substantial part on innocuous statements Weaver made to Pladsen, as well as on Weaver's failure to affirmatively dissuade Pladsen from seeking further information.